OPINION
{¶ 1} Appellant, D.F., appeals from a judgment of the Franklin County Court of Common Pleas, Probate Division, that, among other things, granted Twin Valley Behavioral Healthcare — Columbus Campus ("TVBH-CC") authority to forcibly treat appellant with psychotropic medication. Because the judgment of the probate court is not against the manifest weight of the evidence, we affirm the probate court's judgment.
 {¶ 2} In Franklin Cty. ADAMH Bd. v. D.F., Franklin App. No. 06AP-609,2006-Ohio-4786, this court affirmed a judgment of the Franklin County Court of Common Pleas, Probate Division, that found D.F. to be a mentally ill person subject to hospitalization under R.C. 5122.01(B)(3) and (4). Appellant was then committed to the Franklin County Alcohol Drug and Mental Health Board ("Franklin County ADAMH Board") and was hospitalized at TVBH-CC.
 {¶ 3} Following this court's judgment in D.F., a hearing was held by a magistrate to consider an application by TVBH-CC to forcibly treat appellant with psychotropic medication, and the magistrate granted TVBH-CC's application. Appellant filed objections to the magistrate's decision. Thereafter, the probate court overruled appellant's objections to the magistrate's decision and granted authority to TVBH-CC to forcibly treat appellant. By journal entry, this court denied appellant's motion for a stay of execution of the probate court's judgment pending appeal.
 {¶ 4} From the probate court's judgment, appellant now appeals and assigns a single error for our consideration:
 THE TRIAL COURT'S DECISION TO GRANT AUTHORITY TO FORCIBLY MEDICATE APPELLANT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 5} In this appeal, appellant does not challenge the probate court's overruling of her objections to the magistrate's decision.
 {¶ 6} As to civil judgments, "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." CE. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, syllabus. See, also, In the Matter of K.W., Franklin App. No. 06AP-731, 2006-Ohio-4908, at ¶ 6, quoting CE. Morris Co.
(stating that an appellate court will not reverse a finding that a person is a mentally ill person subject to hospitalization under R.C.5122.01 as against the manifest weight of the evidence if it is " `supported by some competent, credible evidence going to all the essential elements of the case' "); In the Matter of T.B., Franklin App. No. 06AP-769, 2006-Ohio-4789, at ¶ 7, decision clarified on reconsideration by, In the Matter of T.B., Franklin App. No. 06AP-769,2006-Ohio-5300, stay denied by, 111 Ohio St.3d 1468, 2006-Ohio-1468,2006-Ohio-5625, and cause dismissed sua sponte (2007), Ohio St.3d,2007-Ohio-60.
 {¶ 7} When considering whether a civil judgment is against the manifest weight of the evidence, an appellate court is guided by a presumption that the findings of the trier of fact were correct.Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 79-80. "[A]n appellate court should not substitute its judgment for that of the trial court when there exists * * * competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial judge." Id., at 80.
 {¶ 8} "The right to refuse medical treatment is a fundamental right in our country, where personal security, bodily integrity, and autonomy are cherished liberties. These liberties were not created by statute or case law. Rather, they are rights inherent in every individual." Steele v.Hamilton Cty. Mental Health Bd. (2000), 90 Ohio St.3d 176, 180, certiorari denied (2001), 532 U.S. 929, 121 S.Ct. 1376. See, also,Washington v. Harper (1990), 494 U.S. 210, 221-222, 110 S.Ct. 1028
(finding that a mentally ill prisoner possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment to the United States Constitution).
 {¶ 9} "The right to refuse medication, however, is not absolute and it must yield when outweighed by a compelling governmental interest."Steele, at 181, citing Cruzan v. Dir, Mo. Dept. of Health (1990),497 U.S. 261, 278-279, 110 S.Ct. 2841.
 {¶ 10} In Steele, supra, the Supreme Court of Ohio considered "whether a probate court must find that an involuntarily committed mentally ill person is a danger to himself/herself or others before the court may issue an order permitting employees of the commitment facility to administer antipsychotic medication to the patient against his/her wishes." Id. at 180. In Steele, the Supreme Court of Ohio held in part:
 * * * [W]hen an involuntarily committed mentally ill patient poses an imminent threat of harm to himself/herself or others, the state's interest in protecting its citizens outweighs the patient's interest in refusing antipsychotic medication. Authority for invoking the state's interest flows from the police power of the state. Whether an involuntarily committed mentally ill patient poses an imminent threat of harm to himself/herself or others warranting the administration of antipsychotic drugs against the patient's will is uniquely a medical, rather than a judicial, determination to be made by a qualified physician. A physician may order the forced medication of an involuntarily committed mentally ill patient with antipsychotic drugs when the physician determines that (1) the patient presents an imminent danger of harm to himself/herself or others, (2) there are no less intrusive means of avoiding the threatened harm, and (3) the medication to be administered is medically appropriate for the patient.
Id. at 184; see, also, id. at paragraphs one, two, and three of the syllabus.
 {¶ 11} The Steele court also adopted a view that under a state's parens patriae power,[1] a state can override a mentally ill patient's decision to refuse antipsychotic medication. Id. at 185; see, also, id. at paragraph four of the syllabus. The Steele court instructed:
 * * * Before invoking this power, the state must first prove by clear and convincing evidence that the patient lacks the capacity to give or withhold informed consent regarding treatment. Whether an involuntarily committed mentally ill patient, who does not pose an imminent threat of harm to himself/herself or others, lacks the capacity to give or withhold informed consent regarding treatment is uniquely a judicial, rather than a medical, determination. * * *
Id. at 187; see, also, Cross v. Ledford (1954), 161 Ohio St. 469, at paragraph three of the syllabus (defining "clear and convincing" evidence).[2]
 {¶ 12} If a court finds that a patient does not lack the capacity to give or withhold informed consent regarding treatment, then the state's parens patriae power is not applicable. Steele, at 187. However, if a court finds by clear and convincing evidence that a patient lacks the capacity to give or withhold informed consent regarding treatment, the state's interest overrides a patient's interest in refusing treatment. Id. The Steele court held in part:
 * * * [A] court may issue an order permitting hospital employees to administer antipsychotic drugs against the wishes of an involuntarily committed mentally ill person if it finds, by clear and convincing evidence, that (1) the patient does not have the capacity to give or withhold informed consent regarding his/her treatment, (2) it is in the patient's best interest to take the medication, i.e., the benefits of the medication outweigh the side effects, and (3) no less intrusive treatment will be as effective in treating the mental illness.
Id. at 187-188 and paragraph six of the syllabus.
 {¶ 13} At the hearing before the magistrate where TVBH-CC's application to forcibly treat appellant with psychotropic medication was considered, the state proffered the testimony of Gary Davis, M.D., a staff psychiatrist at TVBH-CC (Tr. Vol. I, 9), and William Bates, M.D., a psychiatrist in Columbus, Ohio, who had been appointed by the court to examine D.F. (Tr. Vol. II, 43; Sept. 27, 2006 Entry.) At the hearing, appellant also testified on her own behalf. (Tr. Vol. II, 58.)
 {¶ l4} At the time of the hearing, Dr. Davis had treated D.F. for approximately three to four months. (Tr. Vol. I, 9.) Dr. Davis opined to a reasonable degree of psychiatric certainty that D.F. lacked capacity to make informed treatment decisions. (Tr. Vol. I, 10.) Dr. Davis testified:
 * * * [D.F.] has a severe mental illness which impairs her judgment, thought, and behavior. Her illness is such that it causes her to be unable to recognize that she's ill, so she's unable to recognize that she's in need of treatment and would benefit from treatment.
 In addition, her delusional paranoia is so prominent in her thinking that it dominates conversations that I have with her to the point that she's really, I don't think able to receive and process treatment information adequately either.
Id.
 {¶ 15} Dr. Davis further testified:
 * * * [D.F.] has extensive delusions about the Mafia, organized crime, white supremacist groups. She feels that she was placed into the hospital as part of a setup by these organizations, and that whenever I go to talk to her about medication, she starts talking about these various delusions as her whole explanation of why she's in the hospital and how she really doesn't need treatment and there's no need to even talk about medication because it's obviously a setup, and so forth.
(Tr. Vol. I, 11.)
 {¶ 16} On cross-examination, Dr. Davis also testified:
 * * * [D.F.] has a severe mental illness that's [sic] impairs her judgment, thought and behavior. This illness causes her to be unable to recognize and appreciate that she is ill and that she is in need of treatment, and her delusional paranoia so dominates her thinking and conversation that it interferes with her ability to receive and process treatment information.
(Tr. Vol. II, 38.)
 {¶ 17} On direct examination, in response to a query whether there was any question that appellant would benefit from treatment, Dr. Davis testified: "There's no question in my mind that she needs treatment and would benefit from it." (Tr. Vol. I, 11.)
 {¶ 18} Dr. Davis then outlined a proposed treatment regimen, which included oral antipsychotic agents, and intramuscular injections, if needed; medications to treat side effects; mood stabilizers, if needed; medication for agitation, if needed; and laboratory studies to monitor D.F.'s condition. (Tr. Vol. I, 12-13; Tr. Vol. II, 27-29.) Dr. Davis also testified that in his opinion the benefits of this proposed treatment regimen outweighed the risks of side effects in D.F.'s case. (Tr. Vol. II, 29.) Dr. Davis further testified that there was no reasonable alternative treatment regimen that would be less intrusive but also effective. (Tr. Vol. II, 30.) According to Dr. Davis, if the proposed treatment regimen were implemented, he expected D.F. to improve such that she could be discharged from the hospital in approximately four to six weeks (Tr. Vol. II, 30-31), and he also expected that D.F. "would have to remain on the medications indefinitely, though once she leaves the hospital." (Tr. Vol. II, 39.) According to Dr. Davis, if D.F. were not treated according to the proposed treatment regimen, he believed D.F. would "remain actively ill for a very long time to come," (Tr. Vol. II, at 31), and would require indefinite hospitalization. Id. According to Dr. Davis, "I've seen no indication of any improvement whatsoever in the four months that she's been here." Id.
 {¶ 19} On cross-examination, when queried about possible side effects, Dr. Davis conceded that death was "remotely possible" as a potential side effect. (Tr. Vol. II, 32.) In response to questioning by appellant's counsel, Dr. Davis also testified about his rationale for choosing Haldol as an antipsychotic agent. (Tr. Vol. II, 33-36.) According to Dr. Davis, if Haldol were used, "I expect over time that [D.F.'s] delusions will gradually decrease and eventually clear up." (Tr. Vol. II, 37.) When questioned whether D.F. would have delusions for the rest of her life, even if she were medicated, Dr. Davis testified: "I would call that a very remote possibility." (Tr. Vol. II, 38.) According to Dr. Davis, with the use of medication, "there's a very good chance" that D.F.'s delusions would "go away." (Tr. Vol. II, 38-39.)
 {¶ 20} Dr. Bates testified that he had an opportunity to examine D.F. and to review the forced medication application. (Tr. Vol. II, 44.) Dr. Bates also testified that he had an opinion based on a reasonable degree of psychiatric certainty regarding D.F.'s capacity to make an informed decision about her treatment regimen. (Tr. Vol. II, 44-45.) As to this opinion, Dr. Bates testified in part:
 Well, I think, as Dr. Davis mentioned a number of times, she has a number of fixed false beliefs. As a result of those beliefs, she does not have the insight into her current situation. She believes she has no mental illness. Obviously, if you have no mental illness, there can be no benefit from treating what you don't have.
 So in her mind, there can be no benefits coming from it, but there are risks. And so, because she starts out with a false premise that there's nothing wrong, she is incapable of coming to a reasonable, balanced conclusion about this.
 So I think, because of the presence of the delusions, she is not able to formulate an accurate interpretation of the situation and come to any kind of reasonable, balanced decision about it.
(Tr. Vol. II, 45.)
 {¶ 21} Dr. Bates testified that the proposed treatment regimen "seems like a standard, rather simple, straightforward approach to the situation." (Tr. Vol. II, at 46.) When queried whether he differed with Dr. Davis at all "in his explanation of the manner in which he would use this treatment regimen," Dr. Bates testified: "Not at all." Id. When questioned whether he concurred with Dr. Davis in his opinion that the benefits of treatment outweighed the risks of side effects, Dr. Bates testified:
 The probability of side effects of any sort is probably less than 30 percent overall. I mean, I see the people on Dr. Davis' units, and I'm not seeing a lot of side effects or anything.
 I think medications tend to be used judiciously, the smallest effective dose as possible. I think the risks are minimal. And I think that without medication, there's not going to be any change; it's just to be as it is or worse over time.
Id.
 {¶ 22} According to Dr. Bates, there was not a less intrusive treatment regimen that would be effective in D.F.'s case. (Tr. Vol. II, 47.) Although Dr. Bates agreed that without treatment D.F. would likely continue to be sick and unable to function indefinitely, Dr. Bates "hesitated" to predicate a particular number of weeks before D.F. could be discharged from the hospital. Id. Dr. Bates also testified that "the literature suggests that the earlier you intervene with this kind of mental illness, the better the long-term prognosis." (Tr. Vol. II, 48, 49-51.) When queried whether he would choose a different medication than that chosen by Dr. Davis, Dr. Bates testified:
 I don't know. I think they're all essentially equally effective, except for Clozaril, which can't really be given against somebody's will. So you're kind of stuck in this category of things that you can give intramuscularly if the person refuses it orally. When you have someone who's refusing things, you have to keep that option in mind.
 I think probably — well, in the case of Haldol, Dr. Davis has a great deal of experience with it, and he feels comfortable with it, he knows the side effects, he knows how to use it, so I think I would probably pick something like that.
(Tr. Vol. II, 51-52.)
 {¶ 23} Dr. Bates offered additional testimony about other potential medication choices that he might have chosen, and the risk of side effects of these other possible choices. (Tr. Vol. II, 52-58.)
 {¶ 24} For her part, when questioned why she did not want to take medications, D.F. testified in part:
 Because I feel that, not only I feel that, but I didn't have any psychiatric issues, and I'm a normal, health [sic], confident, happy, realistic person, that I was discriminated and crimes-by organized crime against me, and there's two reasons why they did that.
 One was because they wanted to get me out of the way. They made assumptions that I was turning them in, because they didn't the [sic] want to go to jail and they didn't want to be fired.
 Two was to use me as a scapegoat, in negotiation with FBI, and they're doing that for the last three years. * * *
(Tr. Vol. II, 69-70.)
 {¶ 25} At one point, the court stated to D.F.: "You do not believe that you have any need for medication." (Tr. Vol. II, 71.) In response, appellant testified: "And I'm not ill." Id.
 {¶ 26} Based upon our review of the evidence, we conclude that the probate court's judgment is supported by some competent, credible evidence. Here, the testimony of Dr. Davis and Dr. Bates, if believed by the probate court as the trier of fact, supports the findings and conclusions of the probate court that by clear and convincing evidence appellant lacked capacity to make informed decisions about her treatment; that the benefits of the proposed treatment regimen outweighed potential side effects; and that no less intrusive treatment would be effective. See, generally, State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus (holding that in a criminal or civil case, a determination of the weight of the evidence and credibility of witnesses is primarily for the trier of facts);Maxton Motors, Inc. v. Schindler (Dec. 26, 1984), Defiance App. No. 4-83-23 (discussing the role of the trier of facts).[3] We further find that appellant has failed to rebut the presumption that the findings of the trier of fact were correct. See, generally, SeasonsCoal. Co., supra, at 79; see, also, id. at 80 (stating that "[t]he underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony").
 {¶ 27} Accordingly, for the foregoing reasons, we hold that the probate court's judgment is not against the manifest weight of the evidence. We therefore overrule appellant's sole assignment of error and affirm the judgment of the Franklin County Court of Common Pleas, Probate Division.
Judgment affirmed.
BRYANT and KLATT, JJ., concur.
[1] In Steele, the Supreme Court of Ohio stated: "A state's parenspatriae power allows it to care for citizens who are unable to take care of themselves." Id. at 185, citing Addington v. Texas (1979),441 U.S. 418, 426, 99 S.Ct. 1804. Because a state's parens patriae power results from a person's inability to care for himself or herself, "it is legitimately invoked in forced-medication cases only when the patient lacks the capacity to make an informed decision regarding his/her treatment." Steele, at 185, citing Davis v. Hubbard (N.D.Ohio 1980), 506 F.Supp. 915, 935-936; Rivers v. Katz (1986), 67 N.Y.2d 485, 496,504 N.Y.S.2d 74, 495 N.E.2d 337.
[2] In Cross, the Supreme Court of Ohio defined "clear and convincing" evidence as follows: "Clear and convincing evidence is that measure or degree of proof which is more than a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Id. at paragraph three of the syllabus.
[3] In Maxton Motors, the court stated in part:
 "While it is for the court to pass upon the competency of a witness, it is a question for the jury to say whether a witness is to be believed, since it sees the manner in which the witness gave his testimony. The veracity of the witness is for its consideration, and it is a generally established rule that the credibility of witnesses, or the extent of the credit due them, is a question for the determination of the jury upon all the competent facts and circumstances of the case before it. The jury may believe all that a witness has said, or part or none of it. Likewise, the jurors may give to the testimony of a witness much, little, or no weight. * * *"
 * * *
Where there is no jury, this function is that of the trial court as trier of fact. Id. quoting 44 Ohio Jurisprudence 3d (1983) 375, Evidence and Witnesses.