OPINION
{¶ 1} Defendant-appellant, Timothy Woogerd, appeals from a judgment of the Franklin County Court of Common Pleas that convicted him of one count of aggravated arson and eight counts of murder. For the reasons that follow, we affirm the judgment of the common pleas court.
 {¶ 2} According to the state, in the early morning hours of December 9, 2003, defendant set fire to the home of Robin Woogerd ("Robin"), his estranged wife, while Robin, her 12-year-old daughter, Natalie Adair ("Natalie"), and Thomas Woogerd *Page 2 
("Thomas"), the infant son of defendant and Robin Woogerd, were asleep inside the home. All three died as a result of injuries sustained in the fire.
 {¶ 3} By indictment, defendant was charged with one count of aggravated arson, and eight counts of aggravated murder with specifications. Defendant pled not guilty to the charges against him. A jury trial was later held. At the close of the state's case-in-chief, and after defendant presented his case, defendant moved for acquittal under Crim.R. 29 as to all charges. The trial court denied these Crim.R. 29 motions.
 {¶ 4} After deliberating, a jury returned a verdict of guilty as to the charge of aggravated arson. The jury, however, returned verdicts of not guilty as to the eight charges of aggravated murder. The jury did, however, return verdicts of guilty as to the lesser-included offense of murder as charged in the aggravated murder counts of the indictment. The trial court thereafter entered judgment and imposed an aggregate sentence of 55 years to life.
 {¶ 5} From the trial court's judgment, defendant appeals. Defendant assigns two errors for our consideration:
 I. THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE APPELLANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION AND WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
 II. A TRIAL COURT MAY NOT SENTENCE A DEFENDANT TO NON-MINIMUM AND CONSECUTIVE SENTENCES BASED ON FACTS NOT FOUND BY THE JURY OR ADMITTED BY APPELLANT IN VIOLATION OF HIS RIGHT TO TRIAL BY JURY CONTRA THE OHIO AND FEDERAL CONSTITUTIONS. *Page 3 
 {¶ 6} Defendant's first assignment of error asserts that his convictions are supported by insufficient evidence and are against the manifest weight of the evidence.
 {¶ 7} When an appellant challenges his or her conviction as not supported by sufficient evidence, an appellate court construes the evidence in favor of the prosecution and determines whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus, superseded by constitutional amendment on other grounds in State v. Smith (1997),80 Ohio St.3d 89; State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52, reconsideration denied, 79 Ohio St.3d 1451; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387. In a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime. State v. Woodward, Franklin App. No. 03AP-398,2004-Ohio-4418, at ¶ 16, cause dismissed, 103 Ohio St.3d 1489,2004-Ohio-5606, reconsideration denied, 104 Ohio St.3d 1428,2004-Ohio-6585.
 {¶ 8} Comparatively, when presented with a manifest-weight argument, an appellate court engages in a limited weighing of the evidence to determine whether the fact finder's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. Thompkins, at 387; Conley, supra; State v.Group, 98 Ohio St.3d 248, 2002-Ohio-7247, at ¶ 77. "The question for the reviewing court [in a manifest-weight claim] is `whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to *Page 4 
grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction.'" Id., quotingState v. Martin (1983), 20 Ohio App.3d 172, 175. See, also,Thompkins, at 387; id. at paragraph four of the syllabus (construing and applying Section 3[B][3], Article IV, Ohio Constitution) (holding that "[t]o reverse a judgment of the trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required").
 {¶ 9} R.C. 2909.02 defines the crime of aggravated arson and provides, in part:
 (A) No person, by means of fire or explosion, shall knowingly do any of the following:
 (1) Create a substantial risk of serious physical harm to any person other than the offender;
 * * *
 (B)(1) Whoever violates this section is guilty of aggravated arson.
 (2) A violation of division (A)(1) or (3) of this section is a felony of the first degree.
See, also, R.C. 2901.01(A)(5)(b) (defining "serious physical harm to persons" as including, among other things, "[a]ny physical harm that carries a substantial risk of death"); R.C. 2901.01(A)(8) (defining "substantial risk" as "[a] strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist").
 {¶ 10} Under R.C. 2901.22(B), "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will *Page 5 
probably be of a certain nature." R.C. 2901.22(B) further provides that "[a] person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 11} Accordingly, to sustain defendant's aggravated arson conviction, the state had the burden of proving beyond a reasonable doubt that defendant was aware that his conduct, namely setting fire to Robin's home, would create a strong possibility of substantial risk of serious physical harm to the occupants within the home. R.C. 2901.05(A);2909.02(A)(1); 2901.22(B).
 {¶ 12} Here, in its case-in-chief, the state presented no direct evidence that defendant set fire to Robin's house while she and her children were asleep inside the house. See, generally, Black's Law Dictionary (8 Ed.Rev.2004) 596 (defining "direct evidence" as, among other things, "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption").
 {¶ 13} However, the state did present circumstantial evidence to support its claim that defendant set fire to Robin's home and that defendant knew this act would create a strong possibility of a substantial risk of serious physical harm to Robin and the other occupants in the house. See, generally, State v. Flowers, Franklin App. No. 01AP-722, 2002-Ohio-833, appeal not allowed, 96 Ohio St.3d 1439,2002-Ohio-3344 (stating that "[a]n offense's elements can be established by direct evidence, circumstantial evidence, or both"). In State v.Calderon, Franklin App. No. 05AP-1151, 2007-Ohio-377, this court recently discussed circumstantial evidence and its probative value:
 * * * "Circumstantial evidence is the `proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.'" State v. Heny, Franklin App. No. 04AP-1061, 2005-Ohio-3931, at ¶ 33, appeal not allowed, *Page 6 107 Ohio St.3d 1699, 2005-Ohio-6763, quoting State v. Bentz (1981), 2 Ohio App.3d 352, 355, fn. 6, citing 1 Ohio Jury Instructions (1968), Section 5.10(d). Moreover, "[circumstantial evidence has probative value equal to that of direct evidence." Henry, at ¶ 33, citing [State v. Nicely (1988), 39 Ohio St.3d 147, 151]." `[Individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts.'" Henry, at ¶ 33, quoting Bourjaily v. United States (1987), 483 U.S. 171, 179-180, 107 S.Ct. 2775.
Id. at ¶ 25. See, also, State v. Griesheimer, Franklin App. No. 05AP-1039, 2007-Ohio-¶ 837, at ¶ 26.
 {¶ 14} According to the state's evidence, on December 8, 2003, defendant was at Robin's home and, at that time, defendant was wearing "a jumpsuit, like a tan Carhartt jumpsuit," which is "a brown, insulated, coverall type of winter wear." (Tr. Vol. V, 23, 47-48; Tr. Vol. III, 198.) After arriving at the house, defendant and Robin began to drink beer and later they fought. (Tr. Vol. V, 51-52.) Prior to leaving the house in the early evening of December 8, 2003, James Adair, Robin's teenage son, heard defendant say to Robin: "I will kill you." (Tr. Vol. V, 51.) Nevertheless, Robin's son was not fearful for his mother because "I kind of — I wasn't that scared because he was — he's done it so many times before, threatened her that way, and I always kind of thought he was bluffing." (Tr. Vol. V, 52.)
 {¶ 15} During the early morning hours the next day, a fire erupted at Robin's home. Firefighters responded to the scene, extinguished the fire, and recovered Robin, Natalie, and Thomas from the structure. Robin and her children were pronounced dead shortly after they were removed from the house by firefighters. (Tr. Vol. II, 83, 105-106; Vol. III, 26-27.) Autopsies of the bodies revealed that the immediate cause of death was *Page 7 
asphyxia as a consequence of carbon monoxide poisoning. (Tr. Vol. V, 100-101, 105, 112, 117-118.) However, each body also showed evidence of varying amounts of postmortem thermal injuries. (Tr. Vol. V, 93, 115, 119-120.)
 {¶ 16} After conducting an investigation of the fire with other fire department investigators, Firefighter Frank DeFrancisco, a fire investigator with the City of Columbus Division of Fire, determined that an ignitable liquid was used to start the fire at Robin's house (Tr. Vol. III, 179), and that there could have been two separate areas where the fire originated — outside the rear door and on the deck near the rear door of the structure. Id. According to Mr. DeFrancisco, the fire's origin was not near the fireplace (Tr. Vol. III, 159), nor in the basement. (Tr. Vol. III, 141.) Mr. DeFrancisco also concluded that faulty electrical wiring did not cause the fire. (Tr. Vol. III, 137, 175-176, 189-190.) Rather, according to Mr. DeFrancisco, the fire at Robin's house was incendiary in nature. (Tr. Vol. III, 186.)
 {¶ 17} A plastic gas can that contained gasoline was found in a window well on the property (Tr. Vol. III, 165; Tr. Vol. VI, 9-10), and a metal gas can was found at the base of the steps that led into the rear of the residence. (Tr. Vol. III, 193; Tr. Vol. VI, 9-10.) However, although ignitable fluids in the gas cans were found at the fire scene, a search dog did not detect the presence of ignitable liquids at the scene of the fire. (Tr. Vol. IV, 234-236.) Furthermore, the presence of ignitable fluids was not found in samples taken from debris from the fire scene. (Tr. Vol. VI, 8-10.) Also, no fingerprints were recovered from the two gasoline cans. (Tr. Vol. V, 146.)
 {¶ 18} On December 10, 2003, the day following the fire, James Adair and his brothers saw defendant in the neighborhood near Robin's house, and they approached *Page 8 
defendant's car. (Tr. Vol. V, 55-57.) After defendant refused to roll down his window, Shawn Adair, James Adair's brother, kicked through the window, striking defendant in the face. (Tr. Vol. V, 57.) Defendant then drove away and was followed by James Adair, Shawn Adair, and James Adair's stepbrother. These three later flagged down a patrol officer. (Tr. Vol. V, 57-58.)
 {¶ 19} After one of the occupants in the car informed the patrol officer that the driver of a white car at a stoplight "`was the guy that started the fire that killed the people a couple of days ago,'" this police officer "ran the tag" on the car and discovered that the license tag had been expired for about a year. (Tr. Vol. III, 62-63.) The patrol officer then stopped defendant's car and later arrested him for having expired tags and for driving without a license. (Tr. Vol. III, 64.)
 {¶ 20} Defendant was later transported to police headquarters for an interview and his car was impounded. At the time of the police interview, defendant wore a "Carhartt" coverall (Tr. Vol. III, 198), and there were two small burns on defendant's left hand. (Tr. Vol. III, 199-200.) Some of defendant's clothing and evidence recovered from defendant's car were later sent to the state fire marshal's laboratory for analysis. (Tr. Vol. III, 201-215.) After this evidence was analyzed, the presence of gasoline was found on defendant's shoes (Tr. Vol. VI, 10-11); on the right leg of defendant's coveralls, and on gray denim pants that were recovered from the trunk of defendant's car. (Tr. Vol. VI, 12, 15.) Gasoline was also found on rear bumper samples that were taken from defendant's car. (Tr. Vol. VI, 16-17.)
 {¶ 21} During the police interview, a detective found that defendant showed very little emotion when he was informed that his estranged wife, stepdaughter, and son were *Page 9 
killed in a fire at his estranged wife's house. (Tr. Vol. VI, 75.) Defendant informed the detective that during the afternoon of December 8, 2003, he went to Robin's house to talk about a domestic court proceeding that he had failed to attend earlier on December 8. (Tr. Vol. VI, 77.) Defendant told the detective that, later, he, Robin, and his infant son went to the social security office, after which they returned to Robin's home and shared a carryout pizza and watched a football game on television. Defendant further stated that he left Robin's home at approximately 12:30 or 12:45 a.m. on December 9 (Tr. Vol. VI, 77-78), stopped at a carryout, and later parked his car in the parking lot of a strip mall, where he spent the night in his car. (Tr. Vol. VI, 78.)
 {¶ 22} At trial, the police detective who interviewed defendant testified that he "believed" that defendant stated during the interview that he had an argument with his estranged wife on the evening of December 8. Id. As a result of his investigation, the police detective later concluded that defendant and Robin "had a fairly volatile relationship." (Tr. Vol. VI, 79.) Defendant reported to the detective that he had been living out of his car and was not working. (Tr. Vol. VI, 80.) Defendant also informed the detective that he believed that two weeks had passed since he put gasoline in his car, and he did not believe that gasoline would be on his clothing. Id. Defendant also claimed that he was not driving much because he could not afford to put gasoline in his car. Id. When directly questioned whether he had set fire to Robin's home, defendant denied such a claim. (Tr. Vol. VI, 82.)
 {¶ 23} Construing the evidence in favor of the state and assuming the state's witnesses testified truthfully, see Jenks, supra, at paragraph two of the syllabus; Woodward, supra, at ¶ 16, we conclude that sufficient evidence supports a finding that *Page 10 
defendant set fire to Robin's house, and that defendant knew that setting fire to Robin's house would create a strong possibility of substantial risk of physical harm to the occupants of the house.
 {¶ 24} According to the state's evidence, defendant was at Robin's house on the evening before the fire, and while he was there, he and Robin fought. On the evening before the fire, defendant wore coveralls that were the same type that police recovered from defendant; the coveralls that were recovered from defendant contained the presence of gasoline, an ignitable fluid; and an ignitable fluid was used to set fire to Robin's house. Gasoline also was detected on defendant's shoes, as well as on pants that were recovered from the trunk of defendant's car. Additionally, defendant had two burns on his left hand at the time of his arrest.
 {¶ 25} Although these individual pieces of circumstantial evidence are insufficient in themselves to prove that defendant set fire to Robin's house, in cumulation they reasonably may be found to prove that defendant set fire to Robin's house. See Calderon, supra, at ¶ 25, quoting Henry, supra, at ¶ 33, quoting Bourfaily v. United States
(1987), 483 U.S. 171, 179-180 (stating that "`[individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts'").
 {¶ 26} Here, because an ignitable fluid was used in setting the fire; because the presence of an ignitable fluid was found on defendant's clothing and shoes; because defendant's coveralls that had the presence of gasoline on it are the same type that defendant wore on the night before the fire when he fought with Robin and threatened to kill her; and because defendant had two burn marks on his hand, we find that a jury *Page 11 
reasonably could infer from this evidence, in cumulation, that defendant used gasoline, an ignitable liquid, to set fire to Robin's house.
 {¶ 27} Moreover, because, according to the state's evidence, an ignitable fluid was used to set the fire, and because the fire erupted during the early morning hours when the occupants of the house presumably would have been asleep, we also find that a jury reasonably could conclude that defendant knew that setting fire to Robin's house with an ignitable fluid at that time of day would create a strong possibility of substantial risk of physical harm to the occupants of the house. Accordingly, for the reasons set forth above, we hold that defendant's conviction for aggravated arson is supported by legally sufficient evidence.
 {¶ 28} R.C. 2903.02 delineates the crime of murder and provides, in part:
 (B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.
 (C) Division (B) of this section does not apply to an offense that becomes a felony of the first or second degree only if the offender previously has been convicted of that offense or another specified offense.
 (D) Whoever violates this section is guilty of murder, and shall be punished as provided in section 2929.02 of the Revised Code.
 {¶ 29} Under R.C. 2901.01(A)(9)(a), the term "offense of violence" as used in the Ohio Revised Code is statutorily defined as including, among other things, aggravated arson, a violation of R.C. 2909.02. See, also, R.C. 2909.02(B)(2) (aggravated arson) *Page 12 
(providing that a violation of division [A][1] or [3] of R.C. 2909.02 is a felony of the first degree).
 {¶ 30} Accordingly, to sustain defendant's murder convictions in this case, the state had the burden of proving beyond a reasonable doubt that defendant caused the deaths of the occupants in the home as a proximate result of having committed aggravated arson, a felony of the first degree and a statutorily defined offense of violence under R.C.2901.01(A)(9)(a). R.C. 2901.05(A); 2903.02(B); 2909.02(A) (1 ) and (B)(2).
 {¶ 31} Here, as discussed above, we have already held that legally sufficient evidence supports defendant's conviction for aggravated arson, and we have previously observed that the state presented evidence that Robin, Natalie, and Thomas died as a result of injuries sustained in the fire at Robin's house. Because aggravated arson is statutorily defined as an offense of violence that is a felony of the first degree; because sufficient evidence supports defendant's aggravated arson conviction; and because there is evidence that the deaths of Robin and her children were the proximate result of defendant's commission of aggravated arson, we therefore hold that sufficient evidence supports defendant's murder convictions under R.C. 2903.02(B).
 {¶ 32} In addition to asserting that his convictions are not supported by legally sufficient evidence, defendant also asserts that his convictions are against the manifest weight of the evidence.
 {¶ 33} At trial, to support his contention that he was not guilty of aggravated arson or aggravated murder, defendant proffered the testimony of several witnesses, namely, Detective John Weeks, a police officer with the City of Columbus Division of Police; *Page 13 
defendant's former neighbor; defendant's mother and brother; and John Agosti, a fire analyst. Defendant also testified on his own behalf.
 {¶ 34} According to Detective Weeks, during an interview shortly after the fire with James Adair, Robin's son, this son informed him that he overheard an argument between his mother and defendant shortly before he left the house on December 8 (Tr. Vol. VII, 12); however, he did not inform the detective that defendant told his mother that he was going to kill her, or that defendant would burn the house down. (Tr. Vol. VII, 12.) Detective Weeks further testified that James Adair reported to him that he called his mother at approximately 11:30 p.m. on December 8, and she "sounded to be acting fine." (Tr. Vol. VII, 13, 20.)
 {¶ 35} Defendant's former neighbor testified that he lived next door to defendant for about a year beginning in the summer of 2002 until approximately May 2003. (Tr. Vol. VII, 25; 28.) This former neighbor, who described defendant as an "acquaintance" (Tr. Vol. VII, 25), testified that he met Robin and Thomas on various occasions and did not observe any indication that defendant and Robin had any problems between them. (Tr. Vol. VII, 26, 29.)
 {¶ 36} Michael Woogerd, a brother of defendant, testified that he spoke with defendant on the afternoon of December 8 at approximately 2:50 p.m., and "everything seem[ed] to be okay at that point." (Tr. Vol. VII, 50-51.) He also testified that he received a telephone call from defendant later that afternoon at approximately 5 p.m. He also stated that, during this telephone call, defendant "wasn't really uppity up, but he sounded okay, but he just wanted to let me know that he was okay." (Tr. Vol. VII, at 52.) He further testified that defendant interacted with his son, Thomas, "[l]ike a father with his son * * * *Page 14 
[n]ormal," although Michael Woogerd conceded that he did not personally observe defendant with Thomas very often. Id.
 {¶ 37} Defendant's mother, Beverly Woogerd, testified that she telephoned her daughter-in-law, Robin, on December 8, 2003, at approximately 2 p.m., to thank her for a present that she had just received in the mail. (Tr. Vol. VII, 60-61.) During this telephone call, Robin informed her that defendant was at the house and asked defendant's mother if she wanted to speak with him. (Tr. Vol. VII, 63.) Defendant's mother spoke with defendant and, according to defendant's mother, "[things] [s]ounded normal to me, like they always did." Id. Defendant's mother also testified that defendant "loved" his baby. (Tr. Vol. VII, 66.)
 {¶ 38} Defendant himself testified on his own behalf. When asked how he got along with Robin's children from her previous marriage, defendant testified: "Well, I was pretty much just — I got along with them really. I — I just stayed away pretty much. You know. * * * It was just constant yelling in this house, our house, you know, her kids. It was just constant yelling." (Tr. Vol. VII, 71.)
 {¶ 39} Defendant also testified that during his marriage to Robin he moved from the marital residence on one occasion from approximately July 18, 2002, until May 2003. (Tr. Vol. VII, 72, 75, 78.) When asked why he moved, defendant testified: "Well, there was numerous things, but basically I don't know, things weren't fulfilled, the chaos in the family unit. And I was just scared, you know. Robin constantly — not constantly, but whenever we got in an argument, she just said. ` I'll call the cops.' So, that just wasn't my cup of tea so I just moved out. I moved out." (Tr. Vol. VII, at 72.) Defendant testified that he also vacated the marital residence after having been served with a civil protection *Page 15 
order in November 2003. (Tr. Vol. VII, 80.) After defendant vacated the marital residence in November 2003, he briefly stayed with one of his brothers and later with his mother. Defendant also stayed in different motels and lived in his car. (Tr. Vol. VII, 90-101.)
 {¶ 40} Defendant testified that he did not work for "a good portion of 2003" for medical reasons, and he conceded that he had disciplinary problems at work due to a lack of attendance. (Tr. Vol. VII, 76-77.) However, defendant denied that he was "let go" from his employment. (Tr. Vol. VII, 77.) According to defendant, "I was not really let go. It was kind of like in an off-base situation, but I'm still an employee." Id. However, upon cross-examination, defendant testified that between August and December 2003, he did not want to work for his employer, he broke a "last chance agreement," and he failed to show up for work. (Tr. Vol. VII, 131-132.)
 {¶ 41} According to defendant, on December 8, 2003, after speaking with Robin on the telephone, he went over to her house. (Tr. Vol. VII, 102.) While defendant was at the house, Robin received a telephone call informing her that the biological father of her daughter, Natalie, had died earlier in the year. (Tr. Vol. VII, 102-103.) After receiving this news, defendant, Robin and their baby, Thomas, went to the social security office to apply for benefits for Natalie. (Tr. Vol. VII, 103.) After leaving the social security office, they returned to Robin's house. (Tr. Vol. VII, 107-108.) Natalie, who had been at a neighbor's house earlier in the afternoon, apparently returned home later that day sometime during early evening. (Tr. Vol. V, 22, 24; Tr. Vol. VII, 111.)
 {¶ 42} Defendant testified that he did not recall seeing James Adair, Robin's son, when they returned to the house following the visit to the social security office. (Tr. Vol. *Page 16 
VII, 108.) Defendant also denied having any arguments with Robin between 6 and 7 p.m. on December 8. (Tr. Vol. VII, 111.) Defendant testified that he made a fire in the fireplace while Robin and her daughter Natalie went to pick up a pizza. (Tr. Vol. VII, 112.)
 {¶ 43} Defendant also testified that, when he made the fire, besides placing newspaper in the fireplace, he "[put] the boards we got outside from the pallets that the new fence came on," in the fireplace and later added some approximately six-foot old fence planks that Robin brought into the house. (Tr. Vol. VII, 114-115.) Defendant testified that after he unsuccessfully attempted to break the old planks into smaller pieces and after the planks fell down into the fireplace, he "just scooted the end table over * * * and stuffed the board in the fireplace. * * * I would break it off little bit by little bit and keep feeding it a little more." (Tr. Vol. VII, at 116-117.) According to defendant, he burned his finger while tending the fire. (Tr. Vol. VII, 117.)
 {¶ 44} While defendant watched a football game with his infant son, Thomas, Robin and her daughter Natalie played a card game in the kitchen. (Tr. Vol. VII, 119-120.) According to defendant, the football game ended at approximately 12:30 a.m. on December 9. (Tr. Vol. VII, 119.) Defendant testified he left Robin's house at approximately 12:30 p.m., and when he left the house, Robin and Thomas were still awake, but Natalie had retired for the evening. (Tr. Vol. VII, 120.) After stopping for some cigarettes, defendant then parked his car in the parking lot of a paint store, where he remained the rest of the night. (Tr. Vol. II, 121-122.)
 {¶ 45} Defendant testified that the following day, December 10, he attempted to call his estranged wife at approximately 10:30 p.m., but the telephone line was busy. (Tr. Vol. VII, 124-125.) Defendant then drove over to Robin's house and saw yellow tape and *Page 17 
piles of ash in front of the house. (Tr. Vol. VII, 125.) Defendant testified that he went to a neighbor's house and knocked on the door, but no one answered. He then left the scene in his car and planned to "call 9-1-1 or something, you know, or you could get fire or police." (Tr. Vol. VII, 125-126.) However, before defendant could reach a phone, a car pulled up close to defendant's car. One of Robin's sons, who appeared "irate," approached defendant's car. Defendant rolled down his window. Defendant heard this son ask for a "ball bat." Later this son and others succeeded in breaking two windows in his car. Defendant then fled. (Tr. Vol. VII, 126.) Later, defendant was stopped by a police officer. (Tr. Vol. VII, 127.)
 {¶ 46} Defendant's expert witness, John Agosti, a fire analyst and former firefighter, opined "that the fire originated or started at the right front of the fireplace, which is located on the east wall of the family room/kitchen. * * * [I]t's my opinion that the fire originated at the — from the center to the right front of the fireplace at the subflooring level. Not on top of the floor. Not in the room, but actually below the extended hearth and below the fire box." (Tr. Vol. VIII, at 71-72.)
 {¶ 47} Later, Mr. Agosti also testified:
 * * * [T]o kind of summarize my origin area * * * I just — the fire did not start on the top of the floor in the family room. It started in between the floor underneath the tile in the subflooring, either at the subflooring or just below the subflooring at these floor joists right at the right front of the fireplace. That's clearly my determination as to the origin of the fire, where it started. * * *
(Tr. Vol. VIII, 95-96.) *Page 18 
 {¶ 48} Regarding the cause of the fire at Robin's house, Mr. Agosti opined: "Well, my official opinion is that the fire should be classified as an undetermined fire." (Tr. Vol. VIII, at 104.) Mr. Agosti further testified:
 The reason I classified it as undetermined is because I could not eliminate it to just one cause, one potential ignition, or one ignition source. The reason I couldn't eliminate it to one ignition source is the fact that the fire department investigator and State failed to collect and preserve some of these potential ignition sources * * *
 * * *
 There isn't enough physical evidence that was photographed and/or examined scientifically to come to a more definitive conclusion.
(Tr. Vol. VIII, 105-106.)
 {¶ 49} However, even though Mr. Agosti testified that he was unable to identify one ignition source as the cause of the fire, Mr. Agosti testified that "the most probable cause of this fire had to do with [the] fireplace." (Tr. Vol. VIII, at 109.) Based on his investigation, Mr. Agosti surmised that the fireplace in Robin's house lacked a metal safety strip and, as a consequence, a burning ember may have fallen through a crack in the grout of the extended hearth onto the combustible sub flooring, or radiant heat may have spread onto the combustible sub flooring, thereby creating a fire. (Tr. Vol. VIII, 109-117.)
 {¶ 50} When asked whether classifying the fire as undetermined indicated a lack of confidence in his conclusions, Mr. Agosti testified:
 Well, it indicates my lack of ability to rule out all possibilities that we've already spoken about. However, I mentioned earlier that I do have a level of confidence as to what the most probable of those remaining sources of ignition are, and I *Page 19 
think I've told you its that right front of that fireplace either a hot ember or radiant heat that got down into that crack from an operating fireplace.
 The fireplace was in use that night. There was a lot of-reportedly a lot of wood being burned in it, and it would not be unusual for an ember to happen to fall in there. And as I mentioned, I've had numerous fireplace fires that started in the exact same place.
(Tr. Vol. VIII, 129-130.)
 {¶ 51} After defendant presented his case, the state offered two rebuttal witnesses: James P. Churchwell, a fire investigator with Churchwell Fire Consultants, Inc., and Richard Peter Kraly, an architect.
 {¶ 52} Mr. Churchwell testified that on December 11, 2003, he investigated the fire scene on behalf of Westfield Insurance Company. (Tr. Vol. IX, 76-77.) Based on his investigation, Mr. Churchwell concluded "[t]he fire originated on the floor in front of the fireplace, and it extended out the back door into the decking of the porch and underneath the enclosure of the fireplace." (Tr. Vol. IX, at 77.) With regard to a cause of the fire, Mr. Churchwell concluded "[t]hat there was a flammable liquid from the floor of fireplace, in front of the fireplace, out the back door and onto [the] deck." (Tr. Vol. IX, at 86.)
 {¶ 53} When asked by an assistant prosecutor whether, within a reasonable degree of scientific certainty, an ember or radiant heat could have started the fire at the base end of the fireplace, spread into the fireplace enclosure, burn the fireplace enclosure, spread into the attic, burn the attic, burn a hole in the roof and whether debris falling from the roof could have created holes in the back door and on the back decking of Robin's home, Mr. Churchwell opined that "[i]t's completely contrary to the normal fire and path that a fire would take, completely." (Tr. Vol. IX, at 108.) Mr. Churchwell also testified *Page 20 
that, based upon his investigation, there was no indication that receptacles on the outside and inside walls in the family room and kitchen area malfunctioned, and he ruled out an electrical malfunction as the ignition source of the fire. (Tr. Vol. IX, 109; 111.) Mr. Churchwell also found no evidence of electrical failure regarding wiring in the ceiling of the basement. (Tr. Vol. IX, 111-113.)
 {¶ 54} Richard Kraly, a self-employed architect, testified that he was contacted by Westfield Insurance Group to determine whether the fireplace at Robin's house was defective and whether the fireplace contributed to the fire at the house. (Tr. Vol. IX, 162-163.) Based on his investigation, Mr. Kraly concluded the fireplace itself did not appear defective. (Tr. Vol. IX, 163.) When asked whether he had any conclusions as to how the fireplace caught on fire, Mr. Kraly testified that he believed two fires burned simultaneously to cause the damage; namely, a fire burned outdoors underneath the chimney and then traveled through the flue, and another fire burned inside the house. (Tr. Vol. IX, 171-172.)
 {¶ 55} When asked whether he saw a metal strip between the hearth and the fireplace, Mr. Kraly testified: "I don't believe I saw a metal strip at the front edge, no." (Tr. Vol. IX, 166-167.) However, according to Mr. Kraly, the absence of a metal strip was not a cause of concern because "[generally that metal strip was not part of the standard installation in construction 20 years ago. And it's a more recent innovation. The metal strip is more an anchor strip along the front. I didn't see it was pertinent to this matter." (Tr. Vol. IX, 167.) When asked whether the absence of a metal strip could have caused the failure of the fireplace, Mr. Kraly testified, "I don't believe so." Id. *Page 21 
 {¶ 56} On the trial of a criminal or civil case, a determination of the weight of the evidence and credibility of witnesses is primarily for the trier of facts. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. In Woodward, supra, this court explained:
 * * * [T]he jury is free to believe all, part, or none of the testimony of each witness who appears before it. State v. Long (1998), 127 Ohio App.3d 328, 335. The jury is in the best position to view the witnesses and observe their demeanor, gestures and voice inflections, and use those observations in weighing the credibility of the testimony. State v. Wright, Franklin App. No. 03AP-470, 2004-Ohio-677, at ¶ 11. Thus, a reviewing court may not second guess the jury on matters of weight and credibility. Id.
Id. at ¶ 18. See, also, In the Matter of D.F., Franklin App. No. 06AP-1052, 2007-Ohio-617, at ¶ 26, fn. 3, quoting Maxton Motors, Inc. v.Schindler (Dec. 26, 1984), Defiance App. No. 4-83-23 (discussing role of the trier of facts).
 {¶ 57} Here, the jury was free to believe all, part, or none of the testimony of defendant's witnesses, including the testimony of defendant himself, and the testimony of defendant's expert witness as to the origin and cause of the fire at Robin's home. See Woodward, supra, at ¶ 18. Applying the principle that a reviewing court may not second guess the jury on matters of weight and credibility, id., and after reviewing the evidence, we cannot conclude that in resolving evidentiary conflicts the jury clearly lost its way and created such a manifest miscarriage of justice that defendant's convictions must be reversed. SeeGroup, supra, at ¶ 77.
 {¶ 58} We further conclude that the jury's verdicts are supported by sufficient competent, credible evidence to permit reasonable minds to find beyond a reasonable doubt that defendant knowingly set fire to Robin's home while she and her children were *Page 22 
asleep in the home, thereby creating a substantial risk of serious physical harm to Robin and her children, and that Robin and her children died as a proximate result of defendant's setting fire to Robin's home. See Thompkins, supra, at 387.
 {¶ 59} For the foregoing reasons, we therefore hold that defendant's convictions for aggravated arson and murder are not against the manifest weight of the evidence.
 {¶ 60} Accordingly, having concluded that defendant's convictions are supported by legally sufficient evidence and that these convictions are not against the manifest weight of the evidence, we overrule defendant's first assignment of error.
 {¶ 61} Defendant's second assignment of error asserts that the trial court erred by sentencing defendant to non-minimum consecutive sentences based on facts that were not found by the jury, or based on facts to which defendant did not admit. Contending that State v. Foster,109 Ohio St.3d 1, 2006-Ohio-856, reconsideration denied, 109 Ohio St.3d 1408,2006-Ohio-1703, certiorari denied, ___ U.S. ___, 127 S.Ct. 442, is dispositive as to the issues raised by defendant's second assignment of error, plaintiff asks this court to remand the matter to the trial court for re-sentencing only.
 {¶ 62} In its corrected judgment, for purposes of sentencing and pursuant to R.C. 2941.25, the trial court merged: (1) counts two and three of the indictment as to defendant's conviction for the murder of Robin Woogerd; (2) counts four, five, and six of the indictment as to defendant's conviction for the murder of Natalie Adair; and (3) counts seven, eight and nine as to defendant's conviction for the murder of Thomas Woogerd. The trial court did not merge defendant's conviction for aggravated arson with the convictions for murder. The trial court also found that defendant's convictions for the *Page 23 
lesser-included offenses in counts two, four, and seven did not merge as they related to the deaths of three separate victims.
 {¶ 63} After merging sentences for purposes of sentencing, the trial court imposed the following term of incarceration: (1) ten years as to defendant's conviction for aggravated arson as specified in count one of the indictment, after the trial court found that under R.C. 2929.14(C) defendant committed the worst form of aggravated arson; (2) 15 years to life as to defendant's conviction for the lesser-included offense of murder in count two of the indictment; (3) 15 years to life for defendant's conviction for the lesser-included offense of murder in count four of the indictment; and (4) 15 years to life for defendant's conviction for the lesser-included offense of murder in count seven of the indictment. The trial court further ordered defendant to serve the prison sentences consecutively.
 {¶ 64} In Foster, supra, following Apprendi v. New Jersey (2000),530 U.S. 466, 120 S.Ct. 2348, and Blakely v. Washington (2004),542 U.S. 296, 124 S.Ct. 2531, rehearing denied, 542 U.S. 296, 124 S.Ct. 429, the Supreme Court of Ohio held that former R.C. 2929.14(B) and (C), and former 2929.19(B)(2) were unconstitutional because they required judicial fact-finding before imposition of a sentence greater than the maximum term authorized by a jury verdict or admission of the defendant.Foster, at paragraph one of the syllabus; id. at ¶ 83. Concluding that former R.C. 2929.14(B) and (C), and former 2929.19(B)(2) were capable of being severed, the Supreme Court of Ohio severed in their entirety theseBlakely-offending portions of the Ohio Revised Code. Foster, at ¶ 97, 99; see, also, id. at paragraph two of the syllabus. *Page 24 
 {¶ 65} Following Apprendi and Blakely, the Foster court also held that former R.C. 2929.14(E)(4) and 2929.41(A) were unconstitutional because they required judicial finding of facts not proven to a jury beyond a reasonable doubt or admitted by the defendant before the imposition of consecutive sentences. Foster, at paragraph three of the syllabus; id. at ¶ 83. Concluding that former R.C. 2929.14(E)(4) and 2929.41(A) were capable of being severed, the Supreme Court of Ohio severed in their entirety these statutory sections. Foster, at ¶ 97, 99; id. at paragraph four of the syllabus.
 {¶ 66} Additionally, after addressing the merits of the matter before it, the Foster court also ordered, among other things, that "[t]hese cases and those pending on direct review must be remanded to trial courts for new sentencing hearings not inconsistent with this opinion." Id. at ¶ 104.
 {¶ 67} Subsequent to Foster, in State v. Draughon, Franklin App. No. 05AP-860, 2006-Ohio-2445, on reconsideration of a previous judgment, this court considered whether a defendant waived a Blakely challenge if a defendant failed to raise such a challenge in the trial court. Acknowledging the broad language that the Supreme Court of Ohio used inFoster, and construing United States v. Booker (2005), 543 U.S. 220,125 S.Ct. 738 as finding that reviewing courts should apply "`ordinary prudential doctrines,' such as waiver or plain error, to determine whether to remand a case for a new sentencing," Draughon, at ¶ 7, theDraughon court "[held] that a Blakely challenge is waived by a defendant sentenced after Blakely if it was not raised in the trial court." Id. at ¶ 8.
 {¶ 68} Here, the trial court sentenced defendant after the United States Supreme Court rendered Blakely. Thus, defendant could have objected based on Blakely at the *Page 25 
sentencing hearing; however, defendant failed to assert aBlakely challenge at the sentencing hearing. Applying Draughon, because defendant failed to raise his Blakely challenge in the trial court, we therefore hold that defendant waived his Blakely challenge for purposes of this appeal. See, also, Washington v. Recuenco (2006), ___ U.S. ___,126 S.Ct. 2546, 2553 (stating that "[f]ailure to submit a sentencing factor to the jury, like failure to submit an element to the jury, is not structural error").
 {¶ 69} Furthermore, because an appellate court need not consider an error that a party failed to raise before the trial court at a time in which such error could have been corrected or avoided by the trial court, State v. Glaros (1960), 170 Ohio St. 471, paragraph one of the syllabus; State v. Williams (1977), 51 Ohio St.2d 112, paragraph one of the syllabus, vacated in part (1978), 438 U.S. 911, 98 S.Ct. 3137, and modified on other grounds by State v. Gillard (1988), 40 Ohio St.3d 226, paragraph two of the syllabus, we decline to consider defendant'sBlakely challenge in this appeal. Accord State v. Anderson, Franklin App. No. 06AP-174, 2006-Ohio-6152, at ¶ 48-49 (concluding that an appellant's failure to assert a Blakely challenge in the trial court waived appellant's Blakely argument on appeal and did not result in an entitlement to a re-sentencing hearing based on Foster). See, also,State v. Murphy (2001), 91 Ohio St.3d 516, 532, 2001-Ohio-112, reconsideration denied, 92 Ohio St.3d 1451, certiorari denied (2002),534 U.S. 1116, 122 S.Ct. 926, quoting State v. Childs (1968),14 Ohio St.2d 56, 62, certiorari denied (1969), 394 U.S. 1002, 89 S.Ct. 1596
(acknowledging that even constitutional rights may be lost by failing to assert them at a the proper time).
 {¶ 70} Accordingly, for the reasons set forth above, we overrule defendant's second assignment of error. *Page 26 
 {¶ 71} For the foregoing reasons, both of defendant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
SADLER, P.J., and BRYANT, J., concur. *Page 1