[Cite as *State v. Alberston*, 2021-Ohio-2125.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee/Cross-Appellant | : | Appellate Case No. 28722 |
| | : | |
| | : | Trial Court Case No. 2018-CR-1312/1 |
| v. | : | |
| | : | (Criminal Appeal from |
| SHAWN ALBERTSON | : | Common Pleas Court) |
| | : | |
| Defendant-Appellant/Cross-Appellee | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 25th day of June, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER N. KETTER, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee/Cross-Appellant

SARA M. BARRY, Atty. Reg. No. 0090909, 301 West First Street, Suite 207, Dayton, Ohio 45402
      Attorney for Defendant-Appellant/Cross-Appellee

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Shawn Albertson, appeals from his conviction in the Montgomery County Court of Common Pleas after a jury found him guilty of aggravated burglary, aggravated arson, felony murder, aggravated robbery, grand theft of a motor vehicle, grand theft of a firearm, and aggravated possession of drugs. In support of his appeal, Albertson contends that his trial counsel provided ineffective assistance during his motion to suppress hearing and during his trial. Albertson also argues that his convictions for aggravated burglary, aggravated arson, felony murder, and aggravated robbery were not supported by sufficient evidence and were against the manifest weight of the evidence. Albertson further claims that the trial court erred by failing to merge his grand theft of a firearm offense with his aggravated burglary and aggravated robbery offenses at sentencing. Albertson additionally contends that the trial court erred by ordering him to pay restitution without first considering his present and future ability to pay as required by R.C. 2929.19(B)(5). The State filed a cross-appeal asserting that the trial court erred by merging Albertson's aggravated burglary and aggravated robbery offenses with his aggravated arson and felony murder offenses. For the reasons outlined below, the judgment of the trial court will be affirmed in part, reversed in part, and the matter will be remanded to the trial court for the sole purpose of resentencing Albertson.

## Facts and Course of Proceedings

{¶ 2} On August 31, 2018, a Montgomery County grand jury returned a nine-count indictment charging Albertson with the following offenses:

1. **Aggravated Burglary**, R.C. 2911.11(A)(1), first-degree felony;

2.    **Aggravated Arson** (occupied structure), R.C. 2909.02(A)(2), second-degree felony;

3.    **Aggravated Arson** (harm to person), R.C. 2909.02(A)(1), first-degree felony;

4.    **Felony Murder** (aggravated arson occupied structure), R.C. 2903.02(B), unclassified felony;

5.    **Felony Murder** (aggravated arson harm to person), R.C. 2903.02(B), unclassified felony;

6.    **Aggravated Robbery** (serious physical harm), R.C. 2911.01(A)(3), first-degree felony;

7.    **Grand Theft** (motor vehicle), R.C. 2913.02(A)(1), fourth-degree felony;

8.    **Grand Theft** (firearm), R.C. 2913.02(A)(1), third-degree felony; and

9.    **Aggravated Possession of Drugs** (methamphetamine), R.C. 2925.11(A), fifth-degree felony.

{¶ 3} The charges stemmed from allegations that on April 1, 2018, Albertson trespassed inside the Dayton residence of 75-year-old Gerald Manns, and stole money, a handgun, and several other items of Manns' personal property. It was also alleged that Albertson set fire to Manns' residence before leaving the scene and fleeing in Manns' truck. There is no dispute that Manns was subsequently found on the basement floor of his residence and that Manns died as a result of the fire. There is also no dispute that a few hours after the fire, detectives tracked Albertson to a hotel room in Butler Township wherein they discovered drugs, drugs paraphernalia, and several items of Manns'

personal property. Albertson was later arrested and charged with the aforementioned offenses.

### 1. Motion to Suppress

{¶ 4} Albertson pled not guilty to the indicted charges and filed a motion to suppress. Albertson's motion to suppress challenged the admissibility of the evidence discovered in the Butler Township hotel room. In support of his motion, Albertson claimed that the evidence in the hotel room was inadmissible because it was seized via an invalid search warrant that lacked probable cause. The trial court held a hearing on the motion and heard testimony from one witness, Detective Eric Dingee of the Montgomery County Sheriff's Office. The following is a summary of Det. Dingee's suppression hearing testimony.

{¶ 5} On April 1, 2018, Det. Dingee responded to Manns' residence on Merrimac Avenue in Dayton, Ohio, to investigate a suspicious fire and the death of Manns. At that time, Det. Dingee met with Manns' son, Frank Manns. Frank advised Det. Dingee that his father's house looked as though it had been ransacked. Frank also told Det. Dingee that his father's cell phone, .357 magnum handgun, and gray Chevy Silverado truck were missing from the residence.

{¶ 6} Shortly after Det. Dingee learned that Manns' truck was missing, a private citizen reported that a suspicious Chevy Silverado truck was blocking his driveway on Foster Avenue. The truck in question was located only 10 minutes from Manns' residence and was later identified as Manns' missing truck. A witness on Foster Avenue reported that the driver of the truck was a white male. The witness observed the driver

transfer items of property from inside the truck into a white Ford Explorer. The witness reported that a white female was driving the Explorer and that the Explorer had a broken rear driver-side window that was covered with green tape. The witness reported that the male and female drove away in the Explorer, leaving Manns' truck behind.

{¶ 7} After learning this information, Det. Dingee and his partner, Det. Kyle Baranyi, drove around to various hotels, clubs, and parking lots in Montgomery County in search of a white Ford Explorer with green tape on the rear driver-side window. A little after midnight on April 2, 2018, the detectives located the Explorer parked at a Days Inn hotel in Butler Township. After locating the Explorer, the detectives ran the vehicle's license plate and learned that the vehicle was registered to an individual named Ashley Payton. Because the vehicle was parked in front of room numbers 138 and 139, Det. Dingee made contact with the hotel clerk in order to determine who was renting those two rooms. The hotel clerk provided Det. Dingee with registration forms, which showed that room number 139 was registered to an individual named Nancy Dalton. The detectives also conducted a Facebook search on the vehicle's owner, Payton, and discovered that Payton was associated with Dalton on Facebook.

{¶ 8} In order to make contact with the occupants of room 139, Det. Dingee and Det. Baranyi requested the assistance of a uniformed officer. Dep. David Posma later arrived on the scene and knocked on the hotel room door with the two detectives standing beside him. After Dep. Posma applied two series of knocks to the door, a white female, later identified as Dalton, opened the curtain to the hotel room's window. At that time, Dep. Posma identified himself to Dalton and asked Dalton if she would come to the door. When Dalton opened the hotel room door, Det. Dingee and Det. Baranyi identified

themselves and asked if they could come inside the hotel room to discuss a suspicious fire and death that they were investigating. Dalton responded "yes, come in," and motioned all three officers inside the hotel room. Trans. Vol. I, p. 21.

{¶ 9} As soon as Det. Dingee walked inside the hotel room, he observed duffle bags sitting near the front door. One of the duffle bags was open and it contained gallon-sized Ziploc bags that contained several smaller Ziploc bags. The smaller Ziploc bags contained a tannish substance that Det. Dingee believed was methamphetamine or heroin. The Ziploc bags were in Det. Dingee's plain view and Det. Dingee did not have to manipulate the duffle bag in order to see what was inside.

{¶ 10} While inside the hotel room, the detectives asked Dalton if she was driving the Ford Explorer with the green tape on the rear driver-side window. Dalton advised that she was, and that the vehicle belonged to her daughter. Det. Baranyi also asked Dalton if anyone else was in the hotel room. In response, Dalton looked behind her and a white male, later identified as Albertson, walked out of the bathroom. Albertson walked out of the bathroom without any order or show of force from the officers. The officers did not spread out in the hotel room, but stood together in one location side by side.

{¶ 11} Although the officers were not conducting a search, they were nevertheless looking around the hotel room. As Albertson sat beside Dalton on the bed, Det. Dingee noticed that the nightstand next to the bed had its top drawer open. Det. Dingee could see that a handgun was inside the drawer in plain view. Dep. Posma also saw the handgun and immediately told Albertson not to touch it. Dep. Posma then picked up the handgun from the drawer for purposes of officer safety. Without any questioning, Albertson told the detectives that the gun was a pellet gun. After confirming that the gun

was a pellet gun, Dep. Posma placed the gun on a seat behind him.

{¶ 12} In addition to the pellet gun, Det. Dingee observed pill bottles, collectible coins, and a glass pipe for smoking methamphetamine lying on top of the nightstand in plain view. While Det. Dingee was talking to Dalton and Albertson about the fire at Manns' residence, Det. Baranyi whispered to him that one of the pill bottles on the nightstand had Manns' name on it. After this advisement, Det. Dingee looked over at the pill bottles on the nightstand and personally observed the name "Gerald Manns" on one of the pill bottles. Det. Dingee also observed a cell phone lying on top of the hotel room dresser in plain view. Det. Dingee testified that the cell phone was a flip phone, which matched the description of Manns' missing cell phone.

{¶ 13} Det. Dingee and the other officers did not ask Albertson any specific questions in the hotel room. Albertson made no statements to the officers other than voluntarily advising the officers about the pellet gun and denying any knowledge about the fire at Manns' residence. However, due to the pill bottle with Manns' name on it and the information surrounding the Ford Explorer, Det. Dingee suspected that Albertson and Dalton were involved in the fire and Manns' death.

{¶ 14} Det. Dingee testified that he believed there was probable cause to arrest Albertson and Dalton for receipt of stolen property and possession of drugs and drug paraphernalia. Det. Dingee, however, did not place Dalton and Albertson under arrest in the hotel room nor indicate that they were being charged with a crime. Instead, Det. Dingee advised Dalton and Albertson that they were being detained for questioning. In doing so, Det. Dingee placed them in handcuffs and had them transported to the Special Investigations Unit of the Montgomery County Sheriff's Office. When they arrived at the

Sheriff's Office, Det. Baranyi read Albertson his Miranda rights and attempted to conduct an interview. Albertson, however, refused to be interviewed and would not sign the Miranda form. Albertson made no statements during the attempted interview.

{¶ 15} In the meantime, Det. Dingee applied for a warrant to search the hotel room and the white Ford Explorer parked outside. The affidavit in support of the warrant cited the detectives' observations in the hotel room and the information obtained from the witness regarding the Ford Explorer. The search warrant was subsequently granted, which resulted in several items of evidence being seized from the hotel room.

{¶ 16} After considering the foregoing information, the trial court overruled Albertson's motion to suppress. In so holding, the trial court found that Albertson lacked standing to assert a Fourth Amendment challenge to the evidence seized in the hotel room because there was no evidence indicating that Albertson had a reasonable expectation of privacy in the hotel room. The trial court also found that the evidence obtained through the search warrant was admissible since the search warrant was based on incriminating items that the officers lawfully observed in plain view after Dalton had voluntarily consented to them entering the hotel room.

*2. Jury Trial*

{¶ 17} Albertson's case proceeded to a three-day jury trial beginning on January 7, 2020. At trial, the State called 16 witnesses and presented almost 200 exhibits. Albertson also testified in his defense. The following is a summary of the testimony and evidence presented at trial.

{¶ 18} Albertson and Dalton had been in a serious romantic relationship for

approximately seven years. During that time, they lived together and worked together remodeling houses. Their relationship fell apart in early 2018, due to the couple using drugs, which caused them to lose their job and home. In March 2018, Dalton moved into a trailer park on Nottingham Road in Dayton, Ohio. Since Albertson was homeless, and because the weather had been cold, Dalton permitted Albertson to stay with her for a few days. However, on the morning of April 1, 2018, which was Easter Sunday, Dalton told Albertson that it was time for him to leave. This caused Albertson and Dalton to get into an argument, as Albertson did not have anywhere else to stay. Albertson, however, eventually left that morning as Dalton requested.

{¶ 19} When Albertson left, he walked away on foot and took no possessions with him. As Albertson was leaving, Dalton testified that she heard Albertson say that "he wasn't going to do without." Trans. Vol. II, p. 381. Albertson then walked over to Merrimac Avenue where he saw some houses that he thought were abandoned. At trial, Albertson admitted that he went inside Gerald Manns' Merrimac Avenue residence but claimed that no one was inside the residence while he was there. Albertson also admitted to opening several drawers and taking various items of Manns' personal property and putting the property in a gray duffle bag that he had found in a nearby garage. Albertson claimed that he took items such as belt buckles, jewelry, money, pill bottles, and a .357 magnum handgun that Albertson claimed was lying on the bedroom floor. Albertson testified that he had realized the home was not abandoned once he started opening the drawers and taking Manns' property. Before leaving, Albertson testified that he took money, keys, and a cell phone that were in a bowl by Manns' front door. Albertson used the keys to flee the scene in Manns' gray Chevy Silverado that

was parked nearby.   Albertson testified that the truck contained other items of property including a DeWalt drill, drill bits, a large bolt cutter, and a fishing pole.

{¶ 20} After fleeing the residence in Manns' truck, Albertson called Dalton and told her that he was at a Speedway gas station and needed some help starting a vehicle. Surveillance video footage taken from a Speedway on Needmore Road in Dayton showed Albertson pulling into the gas station in Manns' truck at 3:35 p.m. on April 1, 2018.   *See* State's Exhibit Nos. 171 and 172.   The Speedway video footage also showed Dalton pulling into the gas station approximately 20 minutes later at 3:52 p.m.   *Id.*   Dalton was driving her daughter's white Ford Explorer.   Dalton testified that when she arrived at Speedway, Albertson was standing under the hood of a gray truck trying to get it started. Dalton testified that she had never seen the truck before and that she had assumed Albertson borrowed it from someone.   Dalton identified the truck at trial using a picture of Manns' gray Chevy Silverado.

{¶ 21} Dalton testified that they got the truck started, but that it stalled before Albertson could drive it out of the Speedway parking lot.   Dalton testified that she and Albertson started the truck a second time and that she followed Albertson in the Ford Explorer until the truck stalled a couple of blocks away in a nearby neighborhood. Albertson then transferred some duffle bags and boxes of property that were inside the truck into Dalton's Ford Explorer.   Thereafter, Dalton and Albertson left Manns' truck in the location where it had stalled and drove away in the Explorer.

{¶ 22} Dalton testified that she had never previously seen Albertson with the property that he loaded into her Explorer.   Dalton, however, did not immediately ask Albertson where the property came from.   Dalton instead drove Albertson to Burger King

to get a sandwich and to Huber Heights to purchase some methamphetamine. Dalton then drove Albertson to a Days Inn hotel on Miller Lane in Butler Township. Because Albertson did not have a driver's license, Albertson gave Dalton several $2 bills to pay for a hotel room in her name. The hotel clerk that registered Dalton testified that he thought this form of payment was odd. The hotel clerk identified Dalton's registration form at trial, which indicated that he had checked Dalton into the hotel at 6:00 p.m. on April 1, 2018.

{¶ 23} After checking into the hotel, Albertson transferred the property from Dalton's Ford Explorer into the hotel room. Dalton stayed at the hotel room for a few minutes and then left to attend Easter dinner with her family. Dalton testified that Albertson continued to send her text messages that evening asking when she was going to return to the hotel. Dalton testified that she went back to the hotel around 10:30 or 11:00 p.m. to bring Albertson a plate of food. During that time, Dalton asked Albertson where all the property came from. Dalton testified that Albertson said "nobody would say anything about it." Trans Vol. II, p. 411. Dalton also testified that when she asked Albertson what had happened, Albertson described an encounter with "a guy [who] only had $30 in his pocket." Dalton testified that Albertson told her "he found more money, and it pissed him off, and he hit him." Id. at 412. Dalton also testified that Albertson "said something about a paint can blew a door open." Id. at 413.

{¶ 24} Shortly thereafter, Det. Dingee, Det. Baranyi, and Dep. Posma knocked on the hotel room door and announced themselves. When Dalton opened the door, the detectives asked to come inside to discuss a suspicious fire and death that they were investigating. Dalton let the officers inside the hotel room, where they saw several items in plain view that led them to believe Dalton and Albertson were involved in the fire at

Manns' residence. Based on the officers' observations, Det. Dingee obtained a search warrant for the hotel room and thereafter discovered drugs, drug paraphernalia, and several items of Manns' personal property inside, including Manns' .357 magnum handgun, cell phone, and keys.

{¶ 25} Video footage taken from a residence at 332 Nottingham Road, a road which connects to Merrimac Avenue, showed Manns' Chevy Silverado truck driving by the Nottingham residence at 3:07 p.m. on the day of the fire. *See* State's Exhibit Nos. 171 and 172. The video showed that the truck was coming from the direction of Merrimac Avenue. At trial, Albertson admitted that he was the individual driving Manns' truck on Nottingham Road at that time.

{¶ 26} The fire at Manns' residence was reported at 3:24 p.m. by Manns' neighbor, Pamela Perry. *See* State's Exhibit No. 165. Perry testified that she called 9-1-1 after she saw smoke coming from a window of Manns' home and noticed that Manns' truck was not parked at the residence. At around 3:33 p.m., the fire department arrived at the scene, and responders discovered Manns lying on the basement floor of his residence unresponsive. *See* State's Exhibit No. 172. Manns' body was located near the threshold of a storage room that was located in the northeast part of Manns' basement.

{¶ 27} The coroner testified to a reasonable degree of scientific certainty that Manns died as a result of inhaling products of combustion, such as carbon monoxide and other chemical compounds produced during a fire. In addition to superficial burns on his face and forearms, Manns' body had a bruise on his right elbow and a cut on his left hand. According to the coroner, the bruise was inflicted at some point in time prior to Manns' death. Due to Manns' skin being discolored from exposure to carbon monoxide, the

coroner could not determine whether the cut on Manns' hand was inflicted before or after his death. The coroner testified that it was possible the cut was caused by broken glass when responders removed Manns' body from the basement window. Because the bruising on Manns' arm was inflicted prior to his death, the coroner testified that the bruising on Manns' arm would not have been inflicted when Manns' body was removed from the scene of the fire. The coroner also testified that a wallet containing no money was on Manns' person.

{¶ 28} A fire investigation expert from the State Fire Marshal testified that, to a reasonable degree of scientific certainty, the fire was incendiary, i.e., an intentional human act. The fire expert also testified that the fire originated in the basement and had two points of origin. The first point of origin was in the southeast corner of the basement near where a bottle of paint thinner was located. The second point of origin was inside the basement's northeast storage room near where Manns' body was found. The fire expert testified that he collected items near the two origin points for purposes of testing them for the presence of an ignitable liquid. Specifically, the fire expert collected a framed picture, part of a cardboard box, some foam padding, and a piece of the door to the basement's northeast storage room.

{¶ 29} A forensic lab expert from the State Fire Marshal testified that all the items collected, excluding the framed picture, tested positive for a specific class of ignitable liquid known as a medium petroleum distillate. The lab expert explained that medium petroleum distillates include substances such as paint thinners, lighter fluids, mineral spirits, and lamp oils. The lab expert testified that the framed picture tested positive for a slightly heavier petroleum distillate and a medium aromatic product. The lab expert

explained that a medium aromatic product includes substances such as fuel additives or insecticides.

{¶ 30} Multiple items of clothing worn by Manns, Albertson, and Dalton on the day of the fire were also tested for the presence of an ignitable liquid. The forensic lab expert testified that none of Dalton's clothes tested positive for any ignitable liquid. In contrast, all of Manns' clothes (his shoes and jeans) and all of Albertson's clothes (his jeans, t-shirt, jacket, hat, socks, and shoes) tested positive for a medium petroleum distillate, which is the same class of ignitable liquid that was found near the origin points of the fire. Albertson's jacket also tested positive for the presence of gasoline.

{¶ 31} Manns' son, Frank, testified that his father was an antiques dealer who lived by himself at the Merrimac Avenue residence. Frank testified that his father had a substantial amount of property in his residence and noted that his father collected silver dollars, two dollar bills, and various trinkets. Frank also testified that his father restored and refinished wood furniture in his basement. Frank testified that his father had several chemicals such as furniture stripper and paint thinner in the basement for that purpose.

{¶ 32} When Frank walked through his father's residence after the fire, he noticed several unusual things. Frank testified that all the dresser drawers throughout the house were open and/or lying on the floor. Although his father's house was usually very cluttered and messy, Frank testified that it was abnormal for his father to treat his antique furniture in such a manner. Frank also noticed that his father's .357 magnum handgun was missing from the bedroom drawer where it was usually kept. Frank further noticed that money and collectible trinkets were missing from his father's drawers. Frank additionally noticed that his Father's gray Chevy Silverado truck was missing from the

residence. Frank testified that the truck had alternator issues but was drivable to some extent.

{¶ 33} Continuing, Frank testified that his father always went to his sister's house (Frank's aunt) to celebrate Easter. Frank testified that on April 1, 2018, his father would have left for his sister's house around 11:00 a.m. and would have returned home around 1:30 or 2:00 p.m. Frank testified that his father had a normal habit of taking his cell phone and keys with him wherever he went and that his father only had one set of keys. Frank testified that it was common for his father to bring leftover food home from his sister's Easter celebration. After the fire, Frank testified that, while cleaning his father's house, he discovered his father's plate of Easter leftovers lying on the dining room floor.

{¶ 34} Following the presentation of the evidence, the jury deliberated and found Albertson guilty of all nine charges in the indictment. The trial court then held a sentencing hearing, during which the trial court determined that the first six counts in the indictment, i.e., aggravated burglary, two counts of aggravated arson, two counts of felony murder, and aggravated robbery, were allied offenses of similar import that merged into a single conviction. Specifically, the trial court determined that counts two and three (aggravated arson) merged with counts four and five (felony murder). The trial court further determined that count one (aggravated burglary) and count six (aggravated robbery) merged with counts two through five (aggravated arson and felony murder). The State objected to the trial court's merger determination and then elected to have Albertson sentenced on count five, felony murder (aggravated arson/harm to person).

{¶ 35} Following the State's election, the trial court sentenced Albertson to 15 mandatory years to life in prison for felony murder, 12 months in prison for grand theft of

a motor vehicle, two years in prison for grand theft of a firearm, and 9 months in prison for aggravated possession of drugs. All of the prison terms were ordered to be served concurrently to one another with the exception of the two-year prison term for grand theft of a firearm, as that prison term was ordered to be served consecutively to all the other terms. Therefore, the trial court sentenced Albertson to an aggregate term of 17 years to life in prison. The trial court also ordered Albertson to enroll in the Violent Offender Registry and the Arson Offender Registry. The trial court waived court costs, but it ordered Albertson to pay restitution in the amount of $6,347 for Manns' funeral expenses.

{¶ 36} Albertson now appeals from his conviction, raising four assignments of error for review. The State has also filed a cross-appeal, raising a single assignment of error for review.

**First Assignment of Error**

{¶ 37} Under his first assignment of error, Albertson contends that his trial counsel rendered ineffective assistance during the hearing on his motion to suppress and during his jury trial. Specifically, Albertson asserts that his trial counsel was ineffective because counsel did not: (1) solicit testimony in support of his motion to suppress; (2) challenge the accuracy of the ignitable-liquid testing performed on his clothing; (3) subpoena Manns' neighbor, Jack Pelfry, to testify at trial; and (4) sufficiently challenge the credibility of Dalton's trial testimony.

{¶ 38} In order to succeed on an ineffective assistance claim, a defendant must establish: (1) his trial counsel's performance was deficient; and (2) the deficient performance prejudiced him. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052,

80 L.Ed.2d 674 (1984), paragraph two of the syllabus; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

{¶ 39} To establish deficient performance, a defendant must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Id*. at 688; *Bradley* at 142. In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland* at 689. "[A] debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964, ¶ 37 (2d Dist.), citing *Strickland* at 689.

{¶ 40} To establish prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland* at 691.

*1. Failure to Solicit Testimony in Support of Motion to Suppress*

{¶ 41} Albertson first claims that his trial counsel performed deficiently because counsel did not present any testimony at the motion to suppress hearing to: (1) establish his privacy interest in the Butler Township hotel room; and (2) counter Det. Dingee's

testimony that Dalton voluntarily consented to him and the other officers entering the hotel room. Specifically, Albertson claims that his trial counsel should have called him and Dalton to testify at the motion to suppress hearing. Albertson believes that his and Dalton's testimony would have established both his privacy interest in the hotel room and the alleged involuntary nature of Dalton's consent. Albertson also asserts that he and Dalton were both present at court on the day of the suppression hearing and were therefore available to testify regarding these matters.

{¶ 42} As a preliminary matter, we note that there is nothing in the record supporting Albertson's claim that Dalton was present at court during the suppression hearing. We also note that since Dalton was Albertson's co-defendant, Dalton had a right against self-incrimination under the Fifth Amendment to the United States Constitution, and therefore could not have been forced to testify on Albertson's behalf. *State v. Byrd*, 8th Dist. Cuyahoga No. 1998 WL 196185, *3 (Apr. 23, 1998).

{¶ 43} In any event, decisions about which witnesses to call are committed to counsel's professional judgment. *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 127; *State v. Thomson*, 2d Dist. Clark No. 2018-CA-135, 2020-Ohio-600, ¶ 11. As a result, such decisions ordinarily constitute matters of trial strategy that will not be second-guessed by a reviewing court. *Thomson* at ¶ 11; *State v. Koch*, 2019-Ohio-4099, 146 N.E.3d 1238, ¶ 57 (2d Dist.). A decision not to call a particular witness is " 'afforded a presumption of reasonableness,' and to overcome the presumption, a party seeking reversal of a conviction on the basis of ineffective assistance of counsel 'must establish that the testimony of [that] witness would have significantly assisted the defense and that the testimony would have affected the outcome of the case.' " *Thomson* at ¶ 11,

quoting *State v. Ramirez*, 12th Dist. Clermont No. CA2004-06-046, 2005-Ohio-2662, ¶ 39. (Other citation omitted.)

{¶ 44} Here, counsel may have reasonably decided not to call Albertson at the suppression hearing in order to prevent the State from cross-examining Albertson on any inconsistent trial testimony. *See State v. Dukes*, 4th Dist. Scioto Nos. 16CA3745, 16CA3760, 2017-Ohio-7204, ¶ 56-57 (although statements made by a defendant during a motion to suppress hearing cannot not be used against him at a later trial to prove his guilt, they can be used to impeach him). Trial counsel may have decided not to call Dalton for similar reasons or may have simply believed that Dalton would have refused to testify by exercising her Fifth Amendment Right against self-incrimination. Therefore, trial counsel's decision not to call Albertson and Dalton was a matter of trial strategy that we presume was reasonable.

{¶ 45} Albertson has not overcome the presumption of reasonableness because he has not established that either his or Dalton's testimony would have affected the trial court's decision on his motion to suppress. Even if we assume that Albertson and Dalton's testimony would have established that Albertson had a privacy interest in the hotel room (as their trial testimony indicated), this does not change the fact that the trial court found that the officers lawfully entered the hotel room by virtue of Dalton's voluntary consent and subsequently saw incriminating evidence in plain view.

{¶ 46} Although Albertson testified at trial that Dalton let the officers inside the hotel room after he told her not to, the record indicates that the officers reasonably relied on Dalton's apparent authority to consent to their entering the room. "[A] police officer may reasonably rely upon the apparent authority of the occupant of [a] premises to consent to

the officer entering upon those premises, in the absence of any indication that the occupant lacks that authority."   *State v. Harris*, 2d Dist. Montgomery No. 19479, 2003-Ohio-2519, ¶ 22.   *See also State v. Kilgore*, 2d Dist. Montgomery No. 18093, 2000 WL 299546, *4 (Mar. 24, 2000) (finding "nothing inappropriate about the police's entering an apartment after hearing a voice say 'come in,' especially where the officers immediately identified themselves as police officers and did not try to trick, threaten, or force their way into the residence.").   It was reasonable for the officers to assume that Dalton had authority to consent to their entry because Dalton appeared to be an occupant of the room in that she answered the door, and because she was the person to whom the hotel room was registered.   The officers knew the room was registered to "Nancy Lynn Dalton," and they had previously observed pictures of Dalton on Facebook, and thus had some knowledge of her appearance before they encountered her in the hotel room.

**{¶ 47}** With regard to the nature of Dalton's consent, we note that if Albertson and Dalton had offered the same testimony at the suppression hearing as they did at trial, their testimony would not have established that Dalton's consent was involuntary.   At trial, both Dalton and Albertson testified that Dalton allowed the officers inside the hotel room.   Neither Dalton nor Albertson testified that the officers entered the room by force or coercion.   Their testimony also did not indicate that Dalton or Albertson ever withdrew Dalton's consent to their entering.

**{¶ 48}** Even if Albertson and Dalton had offered testimony at the suppression hearing suggesting that Dalton's consent was involuntary, the trial court would have been free to disbelieve their testimony and to rely on Det. Dingee's, which indicated that Dalton voluntarily consented to them entering the hotel room.   Therefore, it is mere speculation

to say that the trial court would have ruled differently on the motion to suppress had Albertson and Dalton testified at the suppression hearing. "It is well established that mere speculation cannot support either the deficient performance or prejudice requirement of an ineffective-assistance claim." *State v. Morgan*, 2d Dist. Montgomery No. 27774, 2018-Ohio-3198, ¶ 16, citing *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 119 and *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 217.

{¶ 49} Because deciding which witnesses to call is a matter of trial strategy, and because Albertson has failed to establish that counsel's failure to have him and Dalton testify at the suppression hearing would have changed the outcome of the proceeding, Albertson has not established deficient performance on the part of his trial counsel nor any resulting prejudice. Therefore, for the reasons outlined above, Albertson's first ineffective assistance claim lacks merit.

2. *Failure to Challenge Ignitable-Liquid Testing Performed on Albertson's Clothing*

{¶ 50} Albertson next claims that his trial counsel failed to adequately challenge the ignitable-liquid testing that was performed on his clothing. As previously discussed, the State Fire Marshal forensic lab expert testified that Albertson's jacket, jeans, t-shirt, shoes, socks, and hat all tested positive for a specific class of ignitable liquid known as a medium petroleum distillate—the same class of ignitable liquid that was found on Manns' clothing and on multiple items of property that were near the two origin points of the fire. Albertson claims that his trial counsel was ineffective because he failed to introduce any evidence or cross-examine any witnesses about the possible contamination of his

clothing as a result of certain items of clothing being collected and packaged together. Albertson specifically contends that the video of his interview with Detectives Dingee and Baranyi shows his clothes being collected in a manner that allowed for contamination.

{¶ 51} Upon review, we find that Albertson's claim regarding the video of his interview is unsupported by the record. The video, which was admitted at the suppression hearing as State's Exhibit No. 3, simply depicted an officer entering the interview room where Albertson was located. At the time the officer entered the interview room, Albertson was fully dressed in his own clothing. The officer later took Albertson out of the room (off camera) for approximately one minute. When Albertson returned to the interview room, he was dressed in jail attire. At no point in time did the video show how Albertson's clothes were handled or packaged. Accordingly, the video had no evidentiary value with regard to the packaging or possible contamination of Albertson's clothing.

{¶ 52} Albertson's claim that his trial counsel failed to cross-examine witnesses about the packaging and possible contamination of his clothing is also unsupported by the record. Although Albertson's counsel did not ask the officer who collected Albertson's clothing whether he packaged each item of clothing separately, counsel did question the State Fire Marshal fire investigation expert about how the clothing was received and packaged. In response to counsel's questioning, the fire expert testified that he had received Albertson and Dalton's clothing from the Montgomery County Sheriff's Office and that the sheriff's office had packaged the clothing in paper. The fire expert also testified that he had repackaged the clothing in evidence bags in the manner that the clothing had been received from the sheriff's office. The fire expert confirmed

that he had packaged all of Dalton's clothing together in one bag because that is how the clothing was received from the sheriff's office. The fire expert also indicated that he had packaged Albertson's socks and hat together in one bag. Trans. Vol. IV, p. 796-797.

{¶ 53} Most importantly, Albertson's trial counsel asked the fire expert whether it was appropriate to package multiple items in a single evidence bag. In response, the fire expert indicated that items are typically not packaged together in order to prevent contamination. *Id.* at 796. Albertson's counsel also questioned the forensic lab expert about how the clothing was packaged. In response, the lab expert testified that some of the clothing she received for testing had been placed in the same evidence bag, such as Albertson's hat and socks. The lab expert also noted that placing items in the same bag could lead to contamination between the items. Trans. Vol. V, p. 851-852. Therefore, for the foregoing reasons, Albertson's claim that his trial counsel failed to cross-examine witnesses regarding the possible contamination of his clothing is unsupported by the record.

{¶ 54} Regardless, the decision to cross-examine witnesses and the extent of such cross-examination are tactical matters involving trial strategy. *State v. Stokes*, 2d Dist. Greene No. 2016-CA-4, 2016-Ohio-7520, ¶ 22; *State v. Russell*, 2d Dist. Montgomery No. 21458, 2007-Ohio-137, ¶ 55. As previously noted, "[a] reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy." *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56 (2d Dist.), citing *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985). This holds true even for debatable decisions, as "[d]ebatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had

been available." *Id.*, citing *State v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992).

**{¶ 55}** That said, no matter what questions Albertson believes his counsel should have asked the witnesses, or what evidence he believes counsel should have offered at trial, the record collectively indicates that only Albertson's hat and socks were packaged together and that Albertson's other items of clothing were packaged and tested separately. We note that the ignitable-liquid test results indicated that Albertson's jacket tested positive for both a medium-petroleum distillate and gasoline, while Albertson's other clothing only tested positive for a medium petroleum distillate. Had the jacket been packaged with the other items of Albertson's clothing, gasoline would likely have been detected on those items of clothing as well. Accordingly, both the testimony and the test results indicate that a most of Albertson's clothing was packaged separately. As such, we fail to see how further questioning or evidence on the topic of contamination from the packaging would have changed the outcome of trial.

**{¶ 56}** For the foregoing reasons, Albertson's second ineffective assistance claim lacks merit.

### 3. Failure to Subpoena Jack Pelfry

**{¶ 57}** For his third ineffective assistance claim, Albertson argues that his trial counsel was ineffective for failing to subpoena Manns' neighbor, Jack Pelfry, to testify at trial. Pelfry was identified as the brother of Pamela Perry, the neighbor who called 9-1-1 to report the fire at Manns' residence. Perry briefly testified that she and Pelfry lived together on Merrimac Avenue. Albertson claims that if Pelfry had been called as a defense witness, Pelfry would have testified that Manns' Chevy Silverado truck was

missing two hours prior to his sister calling 9-1-1. Albertson believes this information would have refuted the State's timeline of events because it would have established that he did not steal Manns' truck shortly before the fire. Despite this, Albertson claims that his trial counsel refused to call Pelfry as a defense witness. Albertson maintains that his trial counsel performed deficiently in that regard, and that said deficient performance prejudiced him. Albertson's argument lacks merit.

{¶ 58} Contrary to Albertson's claim otherwise, Pelfry was subpoenaed to testify at trial for the defense, but Pelfry did not testify. There is nothing in the record indicating why Pelfry did not testify, and the record does not contain a proffer of Pelfry's intended trial testimony. There is also nothing in the record indicating that Albertson's trial counsel refused to allow Pelfry to testify. Therefore, Albertson's ineffective assistance claim is based entirely on matters outside the record. "It is well established that '[a] claim of ineffective assistance of counsel cannot be asserted on direct appeal if it relies on matters outside the record.' " *State v. Whaley*, 2d Dist. Clark No. 2020-CA-15, 2021-Ohio-1434, ¶ 16, quoting *State v. Harris*, 2d Dist. Montgomery No. 27179, 2017-Ohio-9052, ¶ 19, citing *State v. Thomas*, 2d Dist. Montgomery No. 26907, 2017-Ohio-5501, ¶ 28. For this reason, Albertson's third ineffective assistance claim fails.

{¶ 59} Albertson's claim also fails because Albertson cannot establish that the outcome of his trial would have been different had Pelfry appeared at trial and testified that Manns' was truck absent from the residence two hours before his sister called 9-1-1. Two hours before the 9-1-1 call would have been around 1:24 p.m., as Pelfry's sister called 9-1-1 at 3:24 p.m. *See* State's Exhibit No. 165. Manns' son testified that Manns would have returned home from celebrating Easter at his sister's house around 1:30 or

2:00 p.m.   Therefore, it is entirely possible that Manns' truck was absent because Manns had not yet returned home from the Easter celebration.   Albertson also admitted at trial that he was captured on video driving Manns' truck at 3:07 p.m. on East Nottingham Road coming from the direction of Merrimac Avenue.   Accordingly, based on the foregoing evidence, Pelfry's testimony would have done little in the way of refuting the State's timeline of events.

{¶ 60} For the foregoing reasons, Albertson's third ineffective assistance claim lacks merit.

### 4. Failure to Challenge Nancy Dalton's Credibility on Cross-Examination

{¶ 61} For his last ineffective assistance claim, Albertson argues that his trial counsel failed to adequately attack Dalton's credibility on cross-examination. Specifically, Albertson claims that his counsel failed to solicit any testimony concerning Dalton's mental health issues.   The record indicates that Dalton attempted suicide the day before Albertson's original trial date of June 2, 2019, and was hospitalized in the mental health unit of Miami Valley Hospital for three days.   Following that incident, Albertson's trial was continued and the trial court held a hearing to ensure that Dalton was competent to testify. During the competency hearing, Dalton indicated that her suicide attempt was largely a result of having to testify against Albertson, as she claimed she still cared about him.   The trial court ultimately found that Dalton was competent to testify and Dalton thereafter testified at Albertson's rescheduled trial on January 7, 2020.

{¶ 62} While Albertson's trial counsel chose not to attack Dalton's credibility based

on her mental health issues, the record indicates that counsel attacked Dalton's credibility in several other respects. For example, counsel cross-examined Dalton concerning her drug use at the hotel room. Counsel also cross-examined Dalton on the plea agreement she reached with the State, as Dalton agreed to testify against Albertson in exchange for only being charged with aggravated possession of drugs, a fifth-degree felony. *See* State's Exhibit No. 190(A). Counsel further cross-examined Dalton regarding the fact that her daughter and the news exposed her to information about the fire and Manns' death before she agreed to cooperate with the detectives and tell them her version of events.

**{¶ 63}** As previously noted, the extent of counsel's cross-examination is a matter of trial strategy that this court will not second guess on appeal. *Stokes*, 2d Dist. Greene No. 2016-CA-4, 2016-Ohio-7520, at ¶ 22; *Conley*, 2015-Ohio-2553, 43 N.E.3d 775, at ¶ 56. We find that counsel's decision to not question Dalton about her suicide attempt and mental health issues reasonably fell within the realm of trial strategy and therefore may not form the basis of an ineffective assistance claim. Counsel may have believed that inquiring into those topics would have resulted in Dalton gaining sympathy from jurors or may have made her seem more credible since she contemplated suicide as an alternative to testifying against Albertson. Regardless of counsel's reasoning for not questioning Dalton about her mental health, there is no indication that the outcome of Albertson's trial would have been different had counsel questioned Dalton on that topic.

**{¶ 64}** For the foregoing reasons, Dalton's fourth ineffective assistance claim lacks merit.

**{¶ 65}** Having found that all four of Dalton's ineffective assistance claims lack

merit, Dalton's first assignment of error is overruled.

**Second Assignment of Error**

{¶ 66} Under his second assignment of error, Albertson contends that his convictions for aggravated burglary, aggravated arson, felony murder, and aggravated robbery were not supported by sufficient evidence and were against the manifest weight of the evidence. We disagree.

{¶ 67} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." (Citations omitted.) *State v. Dennis*, 79 Ohio St.3d 421, 430, 683 N.E.2d 1096 (1997). "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact." (Citations omitted.) *Id.*

{¶ 68} In contrast, "[a] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *Wilson* at ¶ 12. When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider

witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61, 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶ 14.

{¶ 69} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

*1. Aggravated Burglary*

{¶ 70} As previously noted, Albertson is challenging his conviction for aggravated burglary in violation of R.C. 2911.11(A)(1). That statute provides: "No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another." R.C. 2911.11(A)(1). " 'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or

duration." R.C. 2901.01(A)(3).

{¶ 71} In this case, Albertson admits that he trespassed in Manns' house and committed the offense of theft. Thus, Albertson concedes that the trespass and criminal offense elements of aggravated burglary have been satisfied. Albertson does not specifically challenge the element requiring another person, i.e., Manns, to be present in the residence during the trespass. However, even if Albertson had challenged the presence element, we would find that it was supported by sufficient evidence.

{¶ 72} The evidence established that Manns never left his home without his keys or cell phone, and that both of those items were inside the residence and taken by Albertson. The State also presented evidence establishing that Manns would have returned home from celebrating Easter at his sister's house around 1:30 or 2:00 p.m., and that Albertson was captured on video driving Manns' truck from the direction of Manns' residence at 3:07 p.m. The timing of the video and the fact that Albertson was able to steal Manns' keys and cell phone indicate that Manns would have been home at the time Albertson trespassed.

{¶ 73} The State also presented evidence establishing that Manns' plate of Easter leftovers was lying on the dining room floor. This indicates that Manns had returned home from celebrating Easter at his sister's residence. It is also significant that Manns' was discovered unresponsive in the basement approximately 30 minutes after Albertson left the area. When viewing all this evidence in a light most favorable to the State, a rational factfinder could have reasonably concluded that Manns was present inside the residence at the time Albertson trespassed.

{¶ 74} Albertson nevertheless contends that the State failed to present evidence

establishing that he used force, stealth, or deception to trespass into the victim's home. " 'Force' * * * 'means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing.' " *State v. Brock*, 2d Dist. Clark No. 2018-CA-112, 2019-Ohio-3195, ¶ 24, quoting R.C. 2901.01(A)(1). "[T]he requirement of 'force' is satisfied by 'any effort physically exerted.' " *Id.*, quoting *State v. Hudson*, 2018-Ohio-423, 106 N.E.3d 205, ¶ 16 (2d Dist.) and *State v. Johnson*, 2d Dist. Montgomery No. 26961, 2017-Ohio-5498, ¶ 21. For example, opening an unlocked screen door and walking through an open interior door is sufficient to establish entry by force. *State v. Cantrell*, 2d Dist. Montgomery No. 26975, 2016-Ohio-7623, ¶ 12. *See also State v. McWilliams*, 2d Dist. Greene No. 2000-CA-89, 2001 WL 1203395, *3 (Oct. 12, 2001) ("In Ohio, opening a closed but unlocked door amounts to sufficient force to prove the element of force in the offense of Burglary"); *State v. Ford*, 2d Dist. Montgomery No. 15374, 1996 WL 257442, *2 (May 17, 1996) ("[t]he effort necessary to open a door, locked or unlocked, is sufficient to satisfy the element of 'force' necessary to prove burglary").

**{¶ 75}** Here, Albertson testified that he was initially inside the vacant house next door to Manns' residence when he suddenly "heard a big bang outside." Trans. Vol. V, p. 940. Albertson testified that he "jumped up, looked out the window," and saw the front screen door to Manns' house "smacking back and forth." *Id.* Albertson testified that he then went to Manns' porch and observed that the front door was wide open. Thereafter, Albertson testified that he went inside the open front door. Albertson never testified that the exterior screen door was wide open as well.

**{¶ 76}** The photographic evidence of Manns' front doorway confirms that Manns' home had a main interior door and exterior screen door. *See* State's Exhibit Nos. 1-2,

and 14.  The fact that Albertson saw the screen door smacking back and forth indicates that the screen door would not have remained open on its own.  This is supported by photographic evidence showing a chair holding the screen door open.  *See* State's Exhibit Nos. 2 and 14.  Therefore, Albertson's testimony and the photographic evidence of Manns' doorway indicate that Albertson would have had to physically exert some force to open the screen door before walking through the allegedly open interior front door.  Therefore, when considering the foregoing evidence in a light most favorable to the State, a rational factfinder could have reasonably concluded that the required element of force was satisfied. As a result, we find that the evidence presented at trial was sufficient to establish this element of aggravated burglary.

{¶ 77} Albertson also contends that the State failed to present evidence establishing that he inflicted or attempted to inflict physical harm on Manns.  As previously noted, " '[p]hysical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration."  R.C. 2901.01(A)(3).  The evidence presented at trial established that Manns' son, Frank, found Manns' plate of Easter leftovers on the dining room floor.  The evidence also established that Manns' body was found lying on the basement floor.  From this evidence, a reasonable factfinder could conclude that Albertson encountered Manns in the dining room and possibly forced Manns into the basement.  The coroner also testified that Manns had a bruise on his right arm that was inflicted sometime prior to his death and a cut on his left hand that may or may not have been inflicted prior to his death.  Most significantly, Dalton testified that Albertson made comments to her indicating that he hit the person he the stole the property from, i.e., Manns.  As discussed more fully below, the evidence also establishes that

Albertson started a fire inside Manns' residence, which caused Manns to inhale products of combustion and die. Therefore, when considering the foregoing evidence in a light most favorable to the State, a rational factfinder could have reasonably concluded that Albertson inflicted physical harm on Manns.

{¶ 78} For the foregoing reasons, we find that the State presented sufficient evidence on all the elements of aggravated burglary. Also, after weighing all the evidence and reasonable inferences, we do not find that the jury clearly lost its way and created a manifest miscarriage of justice in finding Albertson guilty of aggravated burglary.

### 2. Aggravated Arson

{¶ 79} Albertson is also challenging his convictions for two counts of aggravated arson—one count in violation of R.C. 2909.02(A)(1), and the other count in violation of R.C. 2902.02(A)(2). Those statutory provisions provide that: "No person, by means of fire or explosion, shall knowingly * * * (1) Create a substantial risk of serious physical harm to any person other than the offender; [or] (2) Cause physical harm to any occupied structure[.]" R.C. 2909.02(A)(1)-(2).

{¶ 80} Albertson does not dispute that the fire at issue resulted in serious, physical harm to Manns and physical harm to Manns' residence. Rather, in challenging his convictions for arson, Albertson maintains that the State failed to present sufficient evidence establishing that he was the individual who started the fire. Albertson claims that the only evidence indicating that he started the fire was circumstantial. "It is, however, well-settled under Ohio law that a defendant may be convicted solely on the

basis of circumstantial evidence." (Citations omitted.) *State v. Nicely*, 39 Ohio St.3d 147, 151, 529 N.E.2d 1236 (1988). "Circumstantial evidence and direct evidence inherently possess the same probative value." *State v. Brown*, 2017-Ohio-8416, 99 N.E.3d 1135, ¶ 40, citing *State v. Franklin*, 62 Ohio St.3d 118, 124, 580 N.E.2d 1 (1991).

**{¶ 81}** In this case, there was ample circumstantial evidence indicating that Albertson started the fire at Manns' residence. There is no dispute that Albertson was present at Manns' residence on the day of the fire, as Albertson admitted to going inside Manns' residence on April 1, 2018, and stealing property therein. Albertson also admitted that he was the person shown on the video driving Manns' truck from the direction of Manns' residence at 3:07 p.m., which was just 17 minutes before Manns' neighbor called 9-1-1 to report smoke coming from Manns' residence. The fact that Albertson was coming from the area of Manns' residence shortly before the victim's neighbor saw smoke coming from the victim's home tends to indicate that Albertson was present at the time the fire started.

**{¶ 82}** Additionally, the State Fire Marshal fire investigation expert testified that the fire was not an accident, but an intentional human act. Testing performed by the State Fire Marshal forensic lab expert also established that Manns' clothing and items of property that were near the two origin points of the fire tested positive for a medium petroleum distillate. Significantly, all of Albertson's clothing also tested positive for a medium petroleum distillate. The forensic lab expert explained that a medium petroleum distillate includes substances such as paint thinners. The fire investigation expert testified, and the photographic evidence established, that a bottle of paint thinner was found near one of the origin points of the fire. *See* State's Exhibit Nos. 28 and 29 and

173(A); Trans. Vol. IV, p. 764-765. Dalton also testified that Albertson mentioned "something about a paint can blew a door open." Trans. Vol. III, p. 413. This statement is consistent with photographic evidence showing paint cans located throughout Manns' basement, *see* State's Exhibit Nos. 24 and 173(A), and it also indicates that Albertson witnessed some kind of explosion in the residence.

{¶ 83} When considering the foregoing evidence in a light most favorable to the State, a rational factfinder could reasonably conclude that Albertson was the individual who started the fire at the victim's residence. Therefore, we find that there was sufficient evidence presented at trial to support Albertson's conviction for aggravated arson.

{¶ 84} As to the weight of the evidence, Albertson challenges the validity of the ignitable-liquid test results on the basis of contamination due to items of his clothing being packaged together. However, as previously discussed, the record indicates that only Albertson's hat and socks were packaged together. The evidence establishes that Albertson's jacket, t-shirt, jeans, and shoes were all packaged and tested separately. But regardless of how Albertson's hat and socks were packaged, the fact remains that all of Albertson's clothing tested positive for the exact same class of ignitable liquid that was found on Manns' clothes and the property that was located near the origin points of the fire.

{¶ 85} Although Albertson testified that he had been wearing the same clothing for a week, no specific evidence was presented at trial to indicate that Albertson had engaged in an activity prior to the fire that would have exposed all of his clothing to a medium petroleum distillate. We note that the forensic lab expert testified that gasoline is not a medium petroleum distillate; accordingly, the medium petroleum distillate on Albertson's

clothes would not have come from Albertson being at a gas station or pumping gas. The expert also testified that a medium petroleum distillate is not present in the glue that is found in shoes. Moreover, there is nothing in the record indicating that Albertson's clothes were exposed to a medium petroleum distillate while he was under the hood of Manns' truck trying to get it to start. Albertson never testified to coming into contact with any fluid from the vehicle, let alone a fluid that qualifies as a medium petroleum distillate.

{¶ 86} Albertson also challenges the credibility of Dalton's testimony concerning his statement about the paint can blowing a door open. However, " 'the jury was free to believe, or disbelieve, any part of the witnesses' testimony, and a conviction is not against the manifest weight of the evidence merely because the jury believed the prosecution's testimony.' " (Citation omitted.) *State v. Pheanis*, 2d Dist. Montgomery No. 26560, 2015-Ohio-5015, ¶ 36, quoting *State v. Arega*, 2012-Ohio-5774, 983 N.E.2d 863, ¶ 30 (10th Dist.). The fact that the jury found Dalton's testimony credible regarding Albertson's statements does not mean that Albertson's conviction was against the manifest weight of the evidence. Therefore, after weighing all the evidence, we cannot say that the jury lost its way or created a manifest miscarriage of justice by finding Albertson guilty of aggravated arson. Accordingly, in addition to being supported by sufficient evidence, Albertson's conviction for both counts of aggravated arson was also not against the manifest weight of the evidence.

### 3. Felony Murder

{¶ 87} Albertson next challenges his conviction for two counts of felony murder, both in violation of R.C. 2903.02(B). That statue provides: "No person shall cause the

death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." The term "offense of violence" as used in the Ohio Revised Code is statutorily defined as including, among other things, aggravated arson in violation of R.C. 2909.02. R.C. 2901.01(A)(9)(a); *State v. Woogerd*, 10th Dist. Franklin No. 05AP-45, 2007-Ohio-1518, ¶ 29

**{¶ 88}** In this case, Albertson's felony murder convictions are predicated on his two aggravated arson offenses, which are felonies of the first- and second-degree. Albertson does not dispute that the fire at issue proximately caused Manns' death. Rather, Albertson contends that the State failed to provide sufficient evidence establishing that he committed the predicate aggravated arson offenses. However, for the reasons discussed above, we find that the State presented sufficient evidence establishing that Albertson committed both counts of aggravated arson. Therefore, because we have already determined that the two predicate offenses of aggravated arson were supported by sufficient evidence and were not against the manifest weight of the evidence, Albertson's two felony murder offenses are likewise supported by sufficient evidence and not against the manifest weight of the evidence.

*4. Aggravated Robbery*

**{¶ 89}** Lastly, Albertson is challenging his conviction for one count of aggravated robbery in violation of R.C. 2911.01(A)(3). That statute provides: "No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, or attempt

to inflict, serious physical harm on another." R.C. 2911.01(A)(3). "Serious physical harm to persons" includes "[a]ny physical harm that carries a substantial risk of death[.]" R.C. 2901.01(A)(5)(b).

{¶ 90} In this case, Albertson concedes that he committed the offense of theft by stealing money and personal property from Manns' residence. Albertson, however, argues that the State failed to present sufficient evidence establishing that he inflicted serious, physical harm on Manns during the theft. Specifically, Albertson claims that there was insufficient evidence to prove that he started the fire that caused Manns' death. However, as noted above, we have already determined that the State presented sufficient evidence to establish that Albertson started the fire at Manns' residence. Upon review, we also find that the State presented sufficient evidence to establish that the fire set by Albertson caused serious, physical harm to Manns, as it resulted in his death. The coroner testified to a reasonable degree of scientific certainty that Manns died as a result of inhaling products of combustion from the fire. Therefore, the evidence sufficiently establishes that Albertson inflicted serious, physical harm on Manns when Albertson set fire to Manns' basement in the course of committing theft and/or fleeing thereafter.

{¶ 91} For the foregoing reasons, we find that the State presented sufficient evidence on all the elements of aggravated robbery. Also, after weighing all the evidence and reasonable inferences, we do not find that the jury clearly lost its way and created a manifest miscarriage of justice in finding Albertson guilty of aggravated robbery.

{¶ 92} Because all of Albertson's sufficiency and manifest weight claims lack merit, his second assignment of error is overruled.

**Third Assignment of Error and State's Cross-Appeal**

{¶ 93} Under his third assignment of error, Albertson claims that the trial court erred by failing to merge his grand theft of a firearm offense with his aggravated burglary and aggravated robbery offenses.[1]   Because the trial court merged the aggravated burglary and aggravated robbery offenses into the aggravated arson and felony murder offenses, Albertson essentially claims that his grand theft of a firearm offense should have merged with the first six counts in the indictment.   On cross-appeal, the State claims that the trial court erred by merging Albertson's aggravated burglary and aggravated robbery offenses with the aggravated arson and felony murder offenses.   Because all the foregoing claims involve the issue of merging allied offenses, we will consider them together.

{¶ 94} R.C. 2941.25 governs allied offenses, and it provides that: "Where the same conduct by [a] defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one."   R.C. 2941.25(A).   The statute also provides that: "Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted

---

[1] Albertson also argued that the trial court erred by ordering the prison term for grand theft of a firearm to run consecutively to the prison term for felony murder.   Albertson, however, withdrew that argument and conceded that if this court determines his grand theft of a firearm offense does not merge with the other offenses, that R.C. 2929.14(C)(3) requires the prison term for grand theft of a firearm to be served consecutively to any other prison term.

of all of them."   R.C. 2941.25(B).

{¶ 95}   " '[T]he defendant bears the burden of establishing his entitlement to the protection, provided by R.C. 2941.25, against multiple punishments for a single criminal act.' "   *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18, quoting *State v. Mughni*, 33 Ohio St.3d 65, 67, 514 N.E.2d 870 (1987).   An appellate court applies "a de novo standard of review in reviewing a trial court's R.C. 2941.25 merger determination."   *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶ 96} "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct."   *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 26.   " '[W]hen determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions * * *: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?' "   *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12, quoting *Ruff* at ¶ 31.   " 'An affirmative answer to any of the above will permit separate convictions.   The conduct, the animus, and the import must all be considered.' " *Id.*

{¶ 97} As to import or significance, offenses are of dissimilar import within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23.   Therefore, "a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each

offense is separate and identifiable from the harm of the other offense." *Id.* at ¶ 26. "The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import." *Id.*

**{¶ 98}** With regard to animus, " '[w]here an individual's immediate motive involves the commission of one offense, but in the course of committing that crime he must, [a] priori, commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime.' " *State v. Ramey*, 2015-Ohio-5389, 55 N.E.3d 542, ¶ 70 (2d Dist.), quoting *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979). In other words, "[i]f the defendant acted with the same purpose, intent, or motive in both instances, the animus is identical for both offenses." *State v. Hudson*, 2013-Ohio-2351, 993 N.E.2d 443, ¶ 54 (2d Dist.), quoting *State v. Lewis*, 12th Dist. Clinton No. CA2008-10-045, 2012-Ohio-885, ¶ 13.

**{¶ 99}** For purposes of clarity, we will first discuss the allied offense arguments raised in the State's cross-appeal and then address the argument raised by Albertson in his third assignment of error.

*1. Aggravated Robbery*

**{¶ 100}** As previously noted, the State's cross-appeal challenges in part the trial court's decision to merge the aggravated robbery offense with the aggravated arson and felony murder offenses. The evidence presented at trial indicates that the aggravated robbery offense was completed when Albertson set fire to Manns' residence while in the course of stealing from Manns and/or fleeing from Manns' residence. Albertson's act of setting the fire was the source of the victim's serious physical harm that was necessary

for an aggravated robbery conviction. Therefore, the aggravated robbery offense was inextricably intertwined with Albertson setting the fire. This indicates that the aggravated robbery offense arose from the same conduct as the aggravated arson and felony murder offenses, as the felony murder offenses were predicated on Albertson committing aggravated arson.

{¶ 101} The evidence presented at trial also indicates that Albertson set the fire in order to facilitate his theft of Manns' property and/or his escape from Manns' residence. That immediate motive involved Albertson committing not only aggravated robbery, but aggravated arson and felony murder as well. Therefore, Albertson possessed a single animus when committing those three offenses.

{¶ 102} The resulting harm caused by the aggravated robbery, aggravated arson, and felony murder offenses was also alike in that each offense involved harm that resulted from the fire, i.e., Manns dying from inhaling products of combustion and fire damage to Manns' residence and property. We have noted that " 'where the conduct that constitutes one offense causes a harm that is not separate and identifiable from the harm caused by the aggravating element of another offense, then the offenses are of a similar import.' " *State v. Ramey*, 2d Dist. Montgomery No. 27636, 2018-Ohio-3072, ¶ 20, quoting *State v. Ruff*, 1st Dist. Hamilton Nos. C-120533, C-120534, 2015-Ohio-3367, ¶ 18 ("*Ruff II*").

{¶ 103} In *Ruff II,* the First District Court of Appeals analyzed the Supreme Court of Ohio's decision in *Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892 ("*Ruff I*") and stated the following:

> The state argued in the Supreme Court—as it does here—that rape

and aggravated burglary are of dissimilar import because rape is a sexually oriented offense while burglary is about trespass into structures. Under this logic, aggravated burglary would always have a dissimilar import from rape or any other act of violence constituting the "aggravating factor," because aggravated burglary always involves a separately identifiable harm in the intrusion into a dwelling. The [Supreme Court] in *Ruff* [*I*], however, specifically rejected this analysis: it "decline[d] to create an absolute rule based upon the definition of the offenses." *Ruff*, [143 Ohio St.3d 114,] 2015-Ohio-995, [34 N.E.3d 892], at ¶ 26.

If there only needed to be one harm that was separate and identifiable, then rape and aggravated burglary could never merge because aggravated burglary will always involve the "separate and identifiable" harm caused by the intrusion into the dwelling. The same would be true of assault or any other crime constituting the aggravating element of physical harm for aggravated burglary. Thus, implicit in its rejection of a categorical rule and remand to this court is the idea that *the offenses are of similar import when the harm caused by one crime is the same harm that is the aggravating circumstance of another crime*.

(Emphasis added.) *Ruff II* at ¶ 15-16.

{¶ 104} Relying on *Ruff II*, we held in *Ramey* that the trial court erred by failing to merge Ramey's felony murder and aggravated burglary offenses because "Ramey's conduct constituting one offense ( * * * murder as a proximate cause of felonious assault), caused a harm that is not separate and identifiable from the harm caused by the

aggravating element of another offense (aggravated burglary)." *Ramey* at ¶ 21. This is because "[w]ithout the physical harm caused by the felonious assault, the burglary would not have had the aggravating element of inflicting physical harm." *Id.*

{¶ 105} In the present case, the aggravating element of Albertson's aggravated robbery offense is the serious physical harm that Manns suffered as a result of the fire, i.e., death from inhaling products of combustion. This is the same harm that resulted from the aggravated arson and felony murder offenses. Without the serious physical harm caused by the aggravated arson and felony murder, the aggravated robbery would not have had the aggravating element of inflicting serious physical harm. This indicates that the aggravated robbery, aggravated arson, and felony murder offenses all had a similar import.

{¶ 106} Because the conduct, animus, and import of the aggravated robbery, aggravated arson, and felony murder offenses were the same, those offenses were properly merged at sentencing.

*2. Aggravated Burglary*

{¶ 107} The State's cross-appeal also challenges the trial court's decision to merge the aggravated burglary offense with the aggravated arson and felony murder offenses. Unlike the aggravated robbery, the evidence presented at trial indicates that Albertson's commission of the aggravated burglary was not dependent on Albertson setting Manns' basement on fire.

{¶ 108} As previously discussed, Manns' plate of Easter leftovers was discovered on the dining room floor whereas Manns' body was found lying on the basement floor.

From this evidence, a reasonable factfinder could conclude that Albertson encountered Manns in the dining room and either forced or told Manns to go down to the basement. Manns' body also had bruising on his right arm that was inflicted sometime prior to his death and a cut on his left hand that may or may not have been inflicted prior to his death. Most significantly, Dalton testified that Albertson made comments to her indicating that he hit Manns during their encounter.

{¶ 109} The foregoing evidence indicates that there was a physical altercation between Albertson and Manns during which Albertson inflicted physical harm on Manns that was separate from the serious, physical harm that he inflicted by causing the fire. The fire was not necessary for Albertson's commission of the aggravated burglary because the aggravated burglary was completed once Albertson physically harmed/hit Manns while in the course of trespassing in Manns' residence. Therefore, the aggravated burglary was committed by conduct that was separate from the conduct that Albertson engaged in when committing aggravated arson and felony murder, i.e., setting the fire. That separate conduct also resulted in separate physical harm. Because the aggravated burglary was committed by separate conduct and resulted in separate harm, the trial court erred in merging Albertson's aggravated burglary offense with his aggravated arson and felony murder offenses.

### 3. Grand Theft of Firearm

{¶ 110} Under his third assignment of error, Albertson argues that the grand theft of a firearm offense should have merged with the aggravated burglary and aggravated robbery offenses. We disagree because the record indicates that the resulting harm is

different for each of those offenses. The harm flowing from grand theft of a firearm was simply Albertson depriving Manns of his .357 magnum handgun. The harm flowing from the aggravated burglary offense included Albertson invading the sanctity of Manns' home and physically injuring Manns by striking him and possibly forcing him in the basement. The harm flowing from the aggravated robbery included not only the loss of Manns' property, but more significantly, the serious, physical harm that Manns suffered and died from as a result of Albertson setting a fire to Manns' residence. Therefore, because the harm from each offense was separate and identifiable, the offenses were of dissimilar import and should not have merged.

{¶ 111} For the foregoing reasons, Albertson's third assignment of error is overruled and the State's sole assignment of error on cross-appeal is overruled in part and sustained in part.

**Fourth Assignment of Error**

{¶ 112} Under his fourth assignment of error, Albertson contends that the trial court erred by imposing $6,347 in restitution at sentencing without properly considering his present and future ability to pay as required by R.C. 2929.19(B)(5). Albertson contends that his sentence of 17 years to life in prison indicates that he has no present or future ability to pay the restitution imposed. Albertson's claim lacks merit.

{¶ 113} Pursuant to R.C. 2929.18(A)(1), the trial court at sentencing may order an offender to pay restitution "to the victim of the offender's crime or any survivor of the victim, in an amount based on the victim's economic loss." It is well established that "[b]efore imposing a financial sanction under section 2929.18 of the Revised Code * * *,

the court shall consider the offender's present and future ability to pay the amount of the sanction or fine." R.C. 2929.19(B)(5). In doing so, "[t]he trial court does not need to hold a hearing on the issue of financial sanctions, and there are no express factors that the court must take into consideration or make on the record." (Citation omitted.) *State v. Culver*, 160 Ohio App.3d 172, 2005-Ohio-1359, 826 N.E.2d 367, ¶ 57 (2d Dist.) "A trial court need not even state that it considered an offender's ability to pay." *State v. Russell*, 2d Dist. Montgomery No. 23454, 2010-Ohio-4765, ¶ 62, citing *State v. Parker*, 2d Dist. Champaign No. 2003-CA-17, 2004-Ohio-1313, ¶ 42.

{¶ 114} "The record should, however, contain 'evidence that the trial court considered the offender's present and future ability to pay before imposing the sanction of restitution.' " *Culver* at ¶ 57, quoting *State v. Robinson*, 3d Dist. Hancock No. 5-04-12, 2004-Ohio-5346, ¶ 17. "The trial court may comply with [this] obligation by considering a presentence investigation report ('PSI'), which includes information about the defendant's age, health, education, and work history." (Citation omitted.) *State v. Willis*, 2d Dist. Montgomery No. 24477, 2012-Ohio-294, ¶ 4.

{¶ 115} In this case, the trial court did not impose any fines and waived court costs at sentencing, but ordered Albertson to pay $6,347 in restitution for Manns' funeral expenses. In doing so, the trial court stated on the record that although Albertson had a lengthy prison sentence, the court had examined Albertson's physical and mental health, his prior work experience, and his education, and determined that Albertson had a future ability to pay the victim's funeral bill. Trans. Vol. VI, p. 1143.

{¶ 116} The trial court also stated that it had considered the information in Albertson's PSI report. The PSI indicated that at the time of sentencing, Albertson was

50 years old with 666 days of jail-time credit. The PSI also indicated that Albertson reported graduating from high school in 1987 and being self-employed for the past three years in the field of home improvement work. Prior to being self-employed, Albertson reported working for J.B. Construction, Dayton Plastics, Schneider Landscaping, and Fugimo Construction. Albertson also reported being in good physical health.

**{¶ 117}** Albertson cites *State v. Phillips*, 2d Dist. Montgomery No. 23252, 2009-Ohio-5305, for the proposition that receiving a life sentence indicates that a defendant has no present or future ability to pay a financial sanction. In *Phillips*, we found that a defendant who was sentenced to "two consecutive life sentences without eligibility for parole" had no present or future ability to pay court costs. *Id*. at ¶ 16. The present case, however, is distinguishable from *Phillips*, as Albertson is eligible for parole and is serving 17 years to life in prison, not two consecutive life terms.

**{¶ 118}** Because *Phillips* is distinguishable, and because the record indicates that the trial court considered Albertson's present and future ability to pay restitution, Albertson's fourth assignment of error is overruled.

## Conclusion

**{¶ 119}** Having overruled all of Albertson's assignments of error and sustained in part the State's sole assignment of error on cross-appeal, the judgment of the trial court is affirmed in part, reversed in part, and remanded to the trial court for the sole purpose of resentencing Albertson. At the resentencing hearing, the trial court shall impose separate sentences for aggravated burglary and grand theft of a firearm, as those offenses do not merge with any other offenses. The aggravated robbery, aggravated

arson, and felony murder offenses shall remain merged.


. . . . . . . . . . . . .

TUCKER, P.J. and EPLEY, J., concur.



Copies sent to:

Mathias H. Heck, Jr.
Heather N. Ketter
Sara M. Barry
Hon. Timothy N. O'Connell